Filed 10/18/13  P. v. Johnson CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G046825 |
| v. | (Super. Ct. No. 10CF3221) |
| AKEEM JELANI JOHNSON, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Lance Jensen, Judge.  Affirmed.

Robert L.S. Angres, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Joy Utomi, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury convicted Akeem Jelani Johnson of rape of an intoxicated person (Pen. Code, § 261, subd. (a)(3)). Johnson contends the trial court's comments at the sentencing hearing demonstrated the court lacked the requisite impartiality required for fair sentencing. For the reasons expressed below, we affirm.

I

FACTUAL AND PROCEDURAL BACKGROUND

Forty-eight-year old Kim K., a resident of Australia, testified she and her two youngest children (ages 11 and 9) decided to surprise her sister's family in Orange County with a Thanksgiving visit on November 25, 2010. Kim consumed at least one glass of wine with Thanksgiving dinner. After dinner, she and her adult nephew, Blake, decided to go out for a drink.

They started out at a Tustin bar called the Swinging Door around 9:00 p.m. Kim drank at least three vodka drinks, and also had a "B-52" shot. She was "feeling the effects" of the alcohol. After about two hours, they took a taxi to another bar called Godfather's. Kim recalled only the first 10 minutes of her arrival. She drank a shot of vodka with Blake's high school friends and said "hi" to a group of four men standing nearby when they commented on her Australian accent. She did not remember leaving the bar, and woke up in the hospital. Kim testified she had been taking Cymbalta for depression at the time of the incident, which can increase the effects of alcohol and cause a person to bruise more easily.

Officer Chris Gerber arrived on the scene around 1:25 a.m. and found Kim slumped over on a mattress in the alley behind an apartment complex near Godfather's. Kim's right pant leg was off her leg, and her right boot was on the ground about 15 feet away. Gerber found a used condom on the ground next to the boot. Gerber had difficulty

2

understanding Kim, who slurred her words and could not provide her name. The jury reviewed a videotape of Gerber's encounter with Kim in the alley.

Trisha Larue, one of Blake's friends, testified Kim appeared sober when she arrived at Godfather's. As the evening progressed, Kim appeared very intoxicated, and began leaning on people, unable to stand. Kim spent a lot of time with a group of men, including "BJ" Stelly, who Larue's friend knew from Tustin High School. Johnson was in BJ's group. Kim was "almost like sitting in someone's lap" and "hanging on them."

Paige Tapia was at Godfather's with Larue and other friends. Tapia also knew Stelly. According to Tapia, Kim appeared tipsy when she arrived, and grew increasingly inebriated as the night wore on. Tapia and Kim stayed at Johnson's table "for the majority of the night." Tapia spent time with Stelly, and Kim was with Johnson. Kim was "mostly just hanging on [Johnson] and kind of talking in his ear." Kim was "[f]lirtatious" and "initiating the actions" with Johnson. The men brought pitchers of beer back to the table and everyone was drinking together. At one point, Kim walked to the bathroom and fell "flat on her face." She was wearing high heels, lost her balance, fell pretty hard and "didn't even catch herself." Another time she dropped "money all over the floor" while trying to get something out of her purse.

Surveillance video from inside Godfather's confirmed Kim spent much of the evening with Johnson's group, hugging, leaning on, and kissing the men, including Johnson. About an hour after her first contact with Johnson's group, and after spending the final 30 minutes standing at their table, Johnson led Kim by the hand out towards the rear area of the bar. Kim stumbled as she made her way through the crowd and leaned over Johnson's back as they walked out of the bar into the alley.

Blood taken from Kim less than three hours after the incident contained a blood alcohol concentration (BAC) of 0.23 percent. A prosecution expert estimated her BAC was 0.27 or 0.28 percent at 1:00 a.m. A blood alcohol level in this range would probably cause "severe mental impairment," and "gross physical impairment, including balance and coordination issues." It could also result in memory loss. The medical expert testified the scientific literature documented incidents of "blacking out" and "brief moments of loss of consciousness" at this level of intoxication.

Semen taken from Kim's vulva and the inside and outside of her mouth, and inside the condom recovered at the scene, matched Johnson's DNA profile. Kim had a small red mark on her right forearm, abrasions on her right pinky finger, right knee and left buttock, and bruises on her right shin and left upper thigh. She had abrasions on the right and left labial fold, and small tears on the left labial fold and the posterior fourchette (entryway to the vagina). She also had tears and abrasions close to the "anal verge," where the regular skin becomes more of a mucous membrane.

Patrick Wolf testified he was at a coin laundry adjacent to Godfather's when he spotted three men standing near the rear driver's side door of a Jeep Cherokee. The men seemed to be "rooting each other on" and made comments, including "'is her pussy wet.'" The men looked toward Wolf and whispered to each other. Wolf approached and saw another man inside the Jeep, and a woman's limbs. The men carried the woman out of the Jeep by her arms and legs across the alley and "heave-hoed her" onto the box spring of a mattress "like throwing somebody into the pool." Wolf yelled something like "[w]hat the fuck you guys doing?" One of the men responded something like "[w]hat the fuck are you going to do about it" and laughed. When Wolf took out his

cell phone, one of the men said "let's get out of here" or "we got to get out of here. We're going to be arrested." They sped off in the Jeep.

The videotape showed Johnson's companions exiting Godfather's into the alley at 1:12 a.m. Wolf's 911 call occurred at 1:25 a.m. Wolf reported the license plate, which belonged to Johnson's Jeep, and stated the woman was "intoxicated or drugged or whatever. . . . [¶] She was definitely incoherent, out of it, didn't know what was going on, didn't even seem like she knew she was talking to me." Wolf identified Stelly from a photograph, and told an officer he asked Stelly what was going on and Stelly told him to "[s]hut the fuck up."

Detective Bonnie Breeze interviewed Johnson around 5:00 a.m. He did not appear to be under the influence, but she smelled alcohol on him. The prosecutor played a video recording of the interview at trial. Johnson stated he went to Godfather's around 8:00 p.m. with Chris and Ronald. He had three or four beers and met Kim, whose name he did not know, as he was about to leave. He spoke with Kim for about five minutes inside the bar. "She was talking [and] coherent." Johnson claimed she followed him when he went outside to use his phone, and he kissed her after she flirted with him. Kim suggested they get in the car. He did not know she was intoxicated and she "act[ed] like she knew what was going on." They began "fooling around" after a couple minutes in the car. He initially denied having vaginal sex, although he admitted she performed oral sex on him. Johnson subsequently admitted "we had [vaginal] sex but I . . . when I . . . she was . . . I found out she was intoxicated, I stopped. She was really . . . she was really drunk and I was like, 'You know what? I'm over this 'cause it's gonna' . . . be something like this so I stopped." He acknowledged using a condom and having an orgasm. She took off her own pants and underwear. He put his penis inside her only for "a minute or

5

two." She went quickly from being lucid to "acting like she couldn't handle herself." After he realized she was intoxicated, he told her to get out and he departed. He estimated they had been in the car about 10 or 15 minutes.

Johnson initially claimed Kim left his car "on her own will" and denied he and his friends lifted her out of the car and threw her on the mattress. Johnson claimed she had her pants on when she got out of his car, but later admitted she did not exit the car on her own and one of his friends helped her out. He tried to put her clothes back on, "sat her down on the mattress," and asked if she was okay. The men left when Kim "said that she was cool" or "I'm good right here." He did not walk her back into the bar because he was "scared" that he would "be misjudged." He denied anyone had been standing by his car watching, or that he had anal sex with Kim, and asserted the sexual activity with Kim "was all consensual."

Johnson's testimony differed from his pretrial statements to Breeze. Johnson, 26 years old at the time of the incident, testified that after Thanksgiving dinner with his family, he, Stelly, and two friends left for Godfather's to meet Stelly's other friends. Johnson's group drank several pitchers of beer. Kim approached their table with other women. She appeared to have been drinking and held a drink in her hand. She returned to the table repeatedly throughout the evening and they discussed various topics. She flirted, touched, hugged and kissed him, and talked about sex in a "joking fashion." He kissed her back.

Around midnight, Kim accepted Johnson's invitation to go to his car. As they walked toward the exit, he held her hand while she hugged him from behind, "kind of draped around [his] shoulders." He acknowledged the videotape showed Kim staggered and swayed backwards as they left the bar, but he did not see this. He believed

6

she was "intoxicated," but not "drunk." They walked past a security guard, who opened the door for them. Johnson unlocked the car door and Kim got into the backseat first. According to Johnson, Kim "[d]efinitely" acted like she knew what was going on as they began "fooling around." Johnson began unbuckling his pants, but Kim finished unbuckling them and pulled his pants down, leaned over him, and began performing oral sex. This might have lasted 20 minutes. He was not wearing a condom and he ejaculated in her mouth.

After the oral sex, they began "fooling around" again. She started taking off her pants, and took off just one pant leg. She left her underwear on but "kind [of] slid them to the side." He retrieved a condom from the center console and inserted his penis into her vagina. He did not "believe . . . she was too intoxicated to know what was going on." After a couple minutes, he noticed Kim was "acting differently." She was "not incoherent, but she was kind of laying there, acting more drunk than she" had been. Johnson claimed she was "definitely responsive" and never passed out. Nevertheless, he immediately stopped because he did not "get down like that. It wasn't right. I seen her acting incoherent, I definitely stopped." He did not ejaculate. Kim did not react or ask why he stopped. He could not recall the timing of various events, but agreed he and Kim were outside for about an hour and a half. He did not know how his condom ended up next to Kim's boot.

Johnson got Kim outside the car, and when Stelly emerged from the bar, Stelly helped him with Kim's pants. He denied his other companions were near the car at this time, and he did not hear anyone make vulgar comments or laugh. As "we were getting her out of the car, trying to help her out," Wolf came from "behind the corner, yelling and screaming . . . 'What are you guys doing? You raping this lady?'" By now,

7

Kim could not stand on her own. Johnson was "terrified, scared" because "[t]he situation didn't look good" and he was afraid he "was going to be misjudged." Kim was "way more intoxicated at this point than when . . . she was inside the bar." He heard Wolf call the police and accuse him of rape. He and Stelly sat Kim down on the mattress. He denied carrying Kim over by her arms and legs and tossing her on the mattress. He asked Kim if she was "'okay sitting right there'" and she responded she was fine. Johnson testified he regretted leaving her on the mattress and admitted it "wasn't the right thing to do," and he should have taken her back into the bar. His friends urged him to leave. Johnson admitted lying repeatedly to Detective Breeze to protect his friends and to minimize his interactions with Kim because he was scared.

Following a trial in March 2012, the jury convicted Johnson of rape of an intoxicated person, defined as "sexual intercourse accomplished with a person not the spouse of the perpetrator" where the "person is prevented from resisting by any intoxicating or anesthetic substance, or any controlled substance, and this condition was known, or reasonably should have been known by the accused." (Pen. Code, § 261, subd. (a)(3); see CALCRIM No. 1002 ["a person is *prevented from resisting* if he or she is so intoxicated that he or she cannot give legal consent. In order to give legal consent, a person must be able to exercise reasonable judgment. In other words, the person must be able to understand and weigh the physical nature of the act, its moral character, and probable consequences. Legal consent is consent given freely and voluntarily by someone who knows the nature of the act involved."].) The jury acquitted Johnson of analogous oral copulation and sodomy charges. At sentencing in April 2012, the trial court imposed the aggravated eight-year prison term.

8

## II

### DISCUSSION

Johnson contends the trial court's "highly inflammatory and inappropriate language in determining [his] punishment" demonstrated "the trial judge had lost his impartiality" and therefore the "sentencing hearing did not conform to the requirements of due process." He argues we must vacate his sentence and remand for a resentencing hearing before a different judge. We disagree.

### A. *Sentencing Hearing*

At the sentencing hearing in April 2012, the trial court first heard from the parties, including Johnson, who maintained Kim consented to having sex with him, explaining that she "kept coming towards me as the aggressor, so I felt that it was consensual because she came to me all the times. I was sitting at the table and she kept coming to me. And we were talking about sex throughout the whole night, so I figured, you know, it was consensual."

The trial court rejected Johnson's explanation and request for mercy, observing that Johnson's conduct contradicted his good character references. The court observed that Johnson seemed to blame the victim for his predicament, explaining, "This is a situation where even to this day you are throwing the victim under the bus, so to speak; or at least in this case, you threw her on a mattress." Responding to Johnson's defense of consensual sex and that Kim willingly accompanied him outside the bar, the court stated, "Well, if that's how it went down in your opinion, then, sir, at some point during your stay in state prison, I would recommend that you get your ears checked and then I get [*sic*] your eyes checked because obviously you did not hear anything nor could you see anything because how you could not come to the conclusion that this young lady

9

was so far gone to the point of almost being unconscious is beyond me.  [¶] Certainly, the videotape, everything this court saw, she was probably borderline, if not unconscious – practically unconscious when you did the unspeakable things that you did to her."

Echoing Detective Breeze's comments to the probation officer,[1] the court remarked, "You are, unfortunately, living in an antiquated caveman [mentality].  You think in order to rape a woman, there has to be violence, kicking, screaming, and dragging.  Obviously, in your upbringing, you were never taught otherwise, which is a shame.  [¶] It would appear that after you began a juvenile crime spree in one of the organizations you got involved in, I think it was [100 Black Men of Orange County], or something of that nature, which would appear to have been an organization that [] was probably designed and set up to mentor, intervene, and capture young, promising men like yourself and show you role models for how a man should conduct himself, regardless of this race.  [¶] But, for some reason, that either didn't happen, didn't stick, or you gathered your thoughts about how a woman should be treated in some other antiquated way."

The court observed Johnson "fail[ed] to understand that it is illegal to engage in sexual intercourse with an intoxicated person" and describing Kim as "'intoxicated' [was] a favorable impression" because she "was borderline, almost unconscious."  The court declared the video showed Kim was "being dragged like a deadweight because she had both of her arms around you and could barely move her feet as you pretty much dragged her out to [your] car and had your way with her."

---

[1]     Detective Breeze had advised the probation officer she doubted Johnson would "ever understand what he did was wrong" and he had a "'caveman mentality, in that he did not believe a woman could be raped unless she was being violently assaulted and there was resistance and screaming."

The court again expressed incredulity concerning Johnson's claim Kim consented to having sex with him, explaining "if that's what you need to say in order to justify why you think you're innocent or justify your manliness, go ahead, that's fine. But actions speak louder than words, Mr. Johnson."

The court continued that "after you have used and abused and done just about everything you could to this young lady in the back of your car and recruit your buddies, who were nothing more than willing accessories and other animals, as they cheered you on outside your car and said some of the most despicable things as they egged you on, in really what was a gang rape. You raped her and they just egged you on. [¶] And I'm sure if they had been given the chance, they probably would have joined in with you. I'm surprised you didn't give them that chance. You just did about everything else to this young lady. Then to recruit them and in a way of just minimizing and degrading this individual to something probably as low, if not lower, than a piece of shit found on the ground and throwing her on some dilapidated mattress in an alleyway is just disgusting."

The court also faulted Johnson for his conduct after Wolf intervened: "you would have thought that maybe a light went on and you would have instantaneously sobered up and realized or become maybe a human being that what you had done was incorrect and wrong. But no. There was an attempt to intimidate [Wolf], threaten him or in some way convey to him that 'it's none of your business and stay out of it.' . . . [¶] [T]hat did not wake you up to how heinous of a crime that you perpetrated on this young lady."

The court found several aggravating factors including "a high degree of callousness as you tossed this individual half clothed, wearing only one boot in 40 degree

11

night weather," the particularly vulnerability of the victim, Johnson's inducement of his "posse of drinking buddies" to assist him in dumping Kim in the alley, "some planning and sophistication" by waiting until Kim was "sufficiently drunk enough" before he made sexual advances, and that Johnson's conduct demonstrated "a serious danger to society." The court also cited Johnson's prior juvenile record, which included punching a store clerk while trying to shoplift beer and stealing pizza from a delivery man, probation violations, and marijuana use, which the court summarized as "ample history of criminal behavior that is only increasing in seriousness, topped off by this case." The court proceeded to impose sentence: "I derive no sadness in sentencing you as follows, sir: As to count 1, . . . the court has a triad spread three years, six years, and eight years. The court sentences you to the aggravated term of eight years."

B. *Forfeiture*

The Attorney General contends Johnson forfeited his claim that the trial court's comments violated his due process rights because he failed to raise the issue below. Although Johnson failed to object when the trial court's comments allegedly revealed improper bias, we exercise our discretion to entertain Johnson's claim because the issue implicates fundamental questions about his constitutional right to an impartial jurist and to forestall any claim counsel was ineffective for failing to object. We therefore assume in our analysis Johnson requested the court recuse itself from imposing sentence, and we further assume the court would have denied his request.

C. *Due Process Standards*

Both the state and federal Constitutions guarantee a criminal defendant the right to an impartial judge. (*People v. Cowan* (2010) 50 Cal.4th 401, 455 (*Cowan*).)

Indeed, "'[a] fair trial in a fair tribunal'" is a fundamental component of due process. (*Caperton v. A. T. Massey Coal Co.* (2009) 556 U.S. 868, 876 (*Caperton*).)

Relying on *Caperton*, the California Supreme Court described the analytical framework used to review an alleged due process claim based on judicial bias. "[W]hile a showing of actual bias is not required for judicial disqualification under the due process clause, neither is the mere appearance of bias sufficient. Instead, based on an objective assessment of the circumstances in the particular case, there must exist "'the probability of actual bias on the part of the judge or decisionmaker [that] is too high to be constitutionally tolerable."' [Citation.] Where only the appearance of bias is at issue, a litigant's recourse is to seek disqualification under state disqualification statutes: 'Because the codes of judicial conduct provide more protection than due process requires, most disputes over disqualification will be resolved without resort to the Constitution.' [Citation.]" (*People v. Freeman* (2010) 47 Cal.4th 993, 996 (*Freeman*).)

*Freeman* explained why the probability of judicial bias, rather than its appearance, violated due process. "The operation of the due process clause in the realm of judicial impartiality . . . is primarily to protect the individual's right to a fair trial. In contrast to this elemental goal, a statutory disqualification scheme, like that found in our Code of Civil Procedure, is not *solely* concerned with the rights of the parties before the court but is also 'intended to ensure public confidence in the judiciary.' [Citation.] Thus, an explicit ground for judicial disqualification in California's statutory scheme is a public perception of partiality, that is, the appearance of bias." (*Freeman, supra,* 47 Cal.4th at pp. 1000-1001.)

Thus, the scope of due process protection for judicial bias claims is narrow. As *Freeman* explains, the Supreme Court has "made it abundantly clear that the due

process clause should not be routinely invoked as a ground for judicial disqualification. Rather, it is the exceptional case presenting extreme facts where a due process violation will be found.  [Citation.]  Less extreme cases – including those that involve the mere appearance, but not the probability, of bias – should be resolved under more expansive disqualification statutes and codes of judicial conduct."  (*Freeman, supra,* 47 Cal.4th at p. 1005.)[2]

The party claiming bias bears the burden of establishing facts supporting its claim.  (*Evans v. Centerstone Development Co.* (2005) 134 Cal.App.4th 151, 162.)  The facts must "clearly . . . establish[]" the requisite bias.  (*People v. Chatman* (2006) 38 Cal.4th 344, 363.)  And, as noted, we employ an objective standard in reviewing these claims.  (*Cowan, supra*, 50 Cal.4th at p. 457.)

D.    *The Record Does Not Establish a Probability of Bias*

Johnson complains the trial court's comments about his "caveman mentality, his poor upbringing, and his deficient manliness" were degrading, and the

---

[2]    As noted above, Johnson did not object or move to disqualify Judge Jensen at the April 20 sentencing hearing.  Approximately one month later, after Johnson filed his notice of appeal, he moved in the trial court to recall his sentence under Penal Code section 1170, subdivision (d), and disqualify Judge Jensen under Code of Civil Procedure section 170.1.  According to the record in Johnson's writ of mandate petition (G047056), Judge Jensen struck Johnson's challenge because the court believed it properly commented on the evidence and imposition of an aggravated sentence did not support disqualification.

This court denied Johnson's writ of mandate petition on June 28, 2012.

The denial of Johnson's statutory disqualification motion is not reviewable on appeal.  Code of Civil Procedure section 170.3, subdivision (d), provides that the matter may be reviewed only by a writ of mandate within 10 days of notice to the parties. (*People v. Panah* (2005) 35 Cal.4th 395, 444 ["the statute means what it says, Code of Civil Procedure section 170.3, subdivision (d), provides the exclusive means for seeking review of a challenge to a judge, whether the challenge is for cause or peremptory"].)

court's reference to his companions as "animals" and its description that Johnson treated the victim like "a piece of shit" showed the court "lost all semblance of impartiality."

In analyzing these comments, we must keep in mind the context in which they occurred. The court heard the evidence at Johnson's trial, watched the video of Johnson and the victim leaving the bar, and read and considered the probation report. Of course, these observations would demonstrate bias if made at the outset of trial, but they take on a different hue at sentencing. The court's comments arguably reflect the community's moral disapproval of Johnson's conduct. It is extraordinarily difficult to disqualify a judge for bias when the judge's remarks reflect what the jurist heard and observed during the proceedings. (See *Liteky v. U.S.* (1994) 510 U.S. 540, 555 [critical or even hostile remarks to counsel or the parties based on facts introduced or events occurring during the proceedings ordinarily do not support a bias motion]; *U.S. v. Barry* (1992) 961 F.2d 260, 263 ["remarks reflecting even strong views about a defendant will not call for a judge's recusal so long as those views are based on his own observations during the performance of his judicial duties"].)

The trial court's comments concerning Johnson's "antiquated caveman mentality" reflected its response to Johnson's explanation that the incident was merely a "misunderstanding" because "we were talking about sex throughout the whole night, so I figured, you know, it was consensual." The court emphasized the video showed the victim was "practically unconscious" and "could barely move her feet as you pretty much dragged her out to her car." The judge's ill-considered remark that Johnson treated the victim like "a piece of shit" was intemperate, but an unbiased witness described how Johnson and his cohorts callously tossed the victim onto a mattress in an alley behind the bar. The description of Johnson's friends as "animals" reflected evidence that Johnson's

15

friends yelled vulgarities while watching Johnson have sex with the victim.  "Mere expressions of opinion by a trial judge based on actual observation of the witnesses and evidence in the courtroom do not demonstrate a bias."  (*People v. Guerra* (2006) 37 Cal.4th 1067, 1111, overruled on another point by *People v. Rundle* (2008) 37 Cal.4th 76, 151.)[3]

Johnson also asserts the judge revealed his bias in the following statement during sentencing:  "It would appear that after you began a juvenile crime spree in one of the organizations you got involved in, I think it was a Hundred Black Men of Orange County or something of that nature, which would appear to have been an organization that would [*sic*] was probably designed and set up to mentor, intervene, and capture young, promising men like yourself and show you role models for how a man should conduct himself, regardless of *this* race."  (Italics added.)  Johnson assumes the court reporter incorrectly transcribed the word "this" for "his," so he asserts the phrase should read "his race."  From this conjecture, Johnson infers the judge was biased because of the court's "gratuitous and puzzling injection of race."  The Attorney General disagrees and argues the court reporter meant to transcribe the word  "their" rather than "this," so the phrase would read "their race."  This argument is also based on supposition.

We decline to entertain these speculations.  If Johnson or the Attorney General suspected the court reporter failed to accurately transcribe the trial court's comments, they should have moved to correct the record under California Rules of Court, rule 8.155(c)(1)(2), which allows the reviewing court to order the correction of any part

---

[3]    In expressing an opinion, the judge must maintain judicial decorum and "be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity . . . ."  (Cal. Code of Jud. Ethics, Canon 3(B)(3), (4).)  The court's use of profanity was hardly a dignified or courteous way to make its point.

16

of the record or order the superior court to settle disputes about errors in the record. The failure to take this step waives the argument.

The court's comments, as transcribed, inartfully lament Johnson's failure to learn from mentors "how a man should conduct himself" and that Johnson instead formed "thoughts about how a woman should be treated in some other antiquated way." The court's comments focused on Johnson's attitude toward women, a legitimate concern given the risk assessment test for sexual offenders placed him in a "high risk" category for reoffending. (See Pen. Code, §§ 290.04, 290.06.) These comments, considered in context, do not demonstrate the "'heightened showing'" necessary for a judicial bias claim. (See *Cowan, supra*, 50 Cal.4th at p. 457.)

Finally, Johnson's reliance on *United States v. Duhart* (9th Cir. 1974) 496 F.2d 941 is unavailing. There, the defendant, a prison inmate, was convicted of raping at knifepoint a prison employee, and assaulting three other women with the intent to commit rape. The Court of Appeal remanded for resentencing before a different judge because the sentencing court suggested that violent revenge by those affected was an appropriate punishment, but it was not the court's "province to do that." (*Id*. at p. 946, fn. 2.) The district court also declared, "There are other things that I have thought about, I could take the robe off, and I was a man before I was a judge, and you have heard the expression, every man has, they ought to cut something out, you know what I am talking about." (*Ibid*.) A judge who admits pondering whether to mutilate a defendant demonstrates actual bias. These comments bear no resemblance to the court's observations during Johnson's sentencing hearing.

In sum, the record here does not show the "'extreme facts'" necessary to show a heightened probability of judicial bias. (*Freeman, supra,* 47 Cal.4th at p. 996.)

### III

#### DISPOSITION

The judgment is affirmed.


ARONSON, J.

WE CONCUR:


MOORE, ACTING P. J.


IKOLA, J.