Filed 3/14/22  In re A.M. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re A.M., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>M.B.,<br><br>        Defendant and Appellant. | A162267<br><br>(Alameda County<br>Super. Ct. No. JD-031538-01) |

In this dependency action, M.B. (Mother) appeals: (1) the juvenile court's denial of her Welfare and Institutions Code[1] section 388 petition arguing that the Alameda County Social Services Agency (Agency) failed to exercise reasonable diligence in attempting to locate Mother, and (2) the court's finding that visitation with Mother would be detrimental to her son, A.M. (Minor).  We reverse with regard to the visitation finding and otherwise affirm.

---

[1] All undesignated section references are to the Welfare and Institutions Code.

1

BACKGROUND

On August 30, 2019, the Agency filed a section 300 petition on behalf of Minor, then six years old. The petition alleged Minor's father (Father) intentionally " 'whoop[ed]' " Minor with a belt and extension cord, causing broken bones and other serious injuries.[2] The petition alleged Mother lived in Arkansas and was unable to meet Minor's needs due to "untreated substance use." The petition was subsequently amended to add an allegation that Minor lived with Mother from 2013 to 2015 and, during this time, Mother hit Minor leaving scars and bruises and failed to protect Minor from Father's physical abuse.

The Agency's detention report stated on August 26, 2019, Father called Minor's maternal grandmother, Linda B.,[3] and asked her to care for Minor because he was no longer able to. Linda saw Minor had injuries and immediately took him to the hospital. The Agency had been unable to contact Mother or Father. Linda told the Agency she had been caring for Minor on and off since he was 18 months old; Father was granted custody approximately one year ago; both parents had neglected and physically abused Minor; and Mother was transient, a drug addict, and had untreated mental health issues. At the September 3, 2019 detention hearing, the juvenile court ordered Minor detained. Neither parent was present at the hearing.

In the Agency's jurisdiction/disposition report, the Agency stated the whereabouts of both parents were still unknown. Linda told the Agency that, when she was caring for Minor when he was between two and four years old,

---

[2] Father is not a party to this appeal and we omit background facts as to him, except where relevant to Mother's appeal.

[3] Linda was Mother's adopted mother.

2

Mother would visit and "hit him excessively." In a September 2019 "CALICO" interview, Minor described being physically abused by Father and Minor's stepmother, and said Mother allowed Father to " 'whoop' " him.[4] Minor told the Agency he likes living with Linda because she takes care of him and feeds him. The Agency recommended bypassing reunification services to both parents. At the September 25, 2019 jurisdiction/disposition hearing, neither parent was present and the proceedings were uncontested. The juvenile court sustained the amended petition and bypassed reunification services pursuant to section 361.5, subdivision (b)(6), finding as to Mother clear and convincing evidence that she hit Minor leaving scars and bruises.[5]

In a "Due Diligence" report, the Agency described its search for Mother. The Agency searched a number of local and state databases that provided no matches for Mother; it also searched online telephone directories with the same result. However, searches of two national databases—MEDS and Accurint—and the California Child Welfare Services Case Management

---

[4] Minor also said, as paraphrased in the report, "Mr. M[.] [Father] whoops harder than Ms. B[.]," using the last name shared by Mother and Linda. Mother argues the reference is to Linda, not Mother, because elsewhere in the report Linda is referred to as "Ms. B[.]" The report more frequently refers to Linda as "Ms. Linda B[.]," however, and given that the report makes no other reference to a possibility or concern that Linda may be physically abusing Minor, we find the reference is likely to Mother or, at most, is ambiguous.

[5] Pursuant to section 361.5, subdivision (b)(6), reunification services need not be provided when the court finds the child has been adjudicated a dependent "as a result of . . . the infliction of severe physical harm to the child . . . by a parent . . . , and the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent or guardian."

System produced addresses for Mother in Oakland, Texas, and Arkansas. The Agency sent letters to Mother at those addresses in September 2019, but either received no reply or the letters were returned. At the December 3, 2019 due diligence hearing, the juvenile court found the Agency exercised due diligence in trying to locate Mother, and set a section 366.26 hearing for January 23, 2020.

On December 31, 2019, the Agency filed a section 366.26 report recommending Linda be appointed Minor's legal guardian. At the January 2020 hearing, Mother was not present but her whereabouts had become known. The juvenile court appointed counsel and continued the hearing.

On January 31, 2020, Mother filed a section 388 petition asking the court to set aside all prior orders, including its orders regarding jurisdiction, disposition, due diligence, and setting a section 366.26 hearing. Mother alleged the changed circumstance that she had informed the Agency of her whereabouts and wanted Minor returned to her care. Mother submitted a declaration averring that numerous people could have provided her whereabouts in August 2019 and that Linda was aware some or all of these people had her contact information. A memorandum in support of the petition argued the Agency did not exercise reasonable diligence in attempting to locate Mother, and the juvenile court's failure to appoint counsel for Mother until January 2020 rendered the proceedings fundamentally unfair. In March 2020, the juvenile court found the petition established a prima facie case and set an evidentiary hearing, with the section 366.26 hearing trailing.[6]

---

[6] The evidentiary hearing was substantially delayed due to the Covid-19 pandemic.

On May 5, 2020, the Agency filed an interim report describing efforts made to locate Mother in August and September 2019. The social worker left multiple messages for Mother at a phone number and mailed two notices to a last known address in Arkansas. The social worker did not receive return phone calls and the mailed notices were returned with the notation, "Return to Sender." In early September 2019, Linda told the social worker that Mother had been calling and " 'harassing' " Linda to get Minor back. In late September 2019, the social worker requested a formal search, the results of which were described in the previous due diligence report.

In July 2020, the Agency filed another interim report. The social worker reported that in an April 2020 conversation, Minor became frustrated and upset when the subject of Mother came up, and he told the social worker he did not remember anything about Mother.[7] The Agency also submitted under seal letters from Minor's current and previous therapists expressing concerns about any plan to reunify Minor and Mother.

Contested proceedings on Mother's section 388 petition began in September 2020 and concluded in March 2021.

*First Social Worker (Ramos)*

Agency social worker Victor Ramos was assigned to Minor's case in August 2019. Ramos testified about efforts he made to contact Mother described in the Agency's May 2020 interim report. When Linda told Ramos Mother had been calling and harassing her, Linda provided Ramos with a new telephone number for Mother, but when he tried the new number and left messages he did not receive a call back. He tried calling that number about eight to ten times. He met with Linda and the maternal great-aunt,

---

[7] The social worker subsequently testified that in July 2020, Minor said he remembered talking to Mother on the phone.

5

who also lives in the home, to ask for Mother's exact location. They told him Mother lived in Arkansas but they did not know her address. Ramos observed a male relative living in the home, but Ramos did not engage him because Linda said he had a cognitive delay and would not be able to assist the Agency.

*Second Social Worker (Barber)*

Agency social worker Athena Barber was assigned to Minor's case in late September 2019. In mid-October, Barber met with Linda and the maternal great-aunt to ask about Mother's whereabouts, and they said Mother was in Arkansas but they did not have an address or phone number. Barber asked Linda if she had any family members who may have had contact with Mother, but Linda did not provide any names. Barber did not speak with the maternal uncle, who also lived in the home, because Linda said he had disabilities. Over the next two months, Barber continued to ask Linda and the maternal great-aunt monthly whether they had spoken to Mother or had updated information.

Barber first made contact with Mother when Mother called her in January 2020 and provided her contact information. Mother told Barber she used to live in Arkansas but was now living in Texas. Mother said she did not speak to Linda. Barber determined it was not in Minor's best interests to be returned to Mother's care, based on the reports from Minor's past and current therapists, Minor's upset reaction when Barber asked him about Mother, and the long time since Minor was last in Mother's care or even had communication with Mother.

*Maternal Uncle*

The maternal uncle testified he was living with Linda and the maternal great-aunt in August 2019. At that time, he did not know where Mother was

living and was not in contact with her. In August 2019, Mother "liked" his Instagram post, but the maternal uncle stopped communicating with Mother after Minor came to live with Linda because Mother deleted her Instagram profile and Linda told him to stop using social media to communicate with Mother.

*Maternal Aunt*

The maternal aunt testified she lived in Arkansas and could have communicated with Mother by telephone or on social media in August, September, and October of 2019. Linda and the maternal great-aunt knew the maternal aunt's phone number; Linda called, texted, and visited the maternal aunt in 2019; and Linda's sister lived around the corner from the maternal aunt, but Linda never asked the maternal aunt for Mother's contact information.

*Mother*

Mother testified in November 2020 that she had lived in Dallas, Texas for a year. Minor lived with Mother until he was three years old, in January 2017, at which point Mother had Minor live with Linda because Mother lost her apartment and did not have a stable home. In July 2017, after Mother moved to Texas, Mother asked Linda to return Minor to her care. Linda told Mother she did not think it was a good idea because Mother had not yet established stability. In August 2017, Mother traveled to California to visit Minor, but she did not bring Minor back with her because she still was not ready to care for Minor. In November 2017, Linda told Mother she could come live with them. Mother stayed until the end of December, when Linda said she did not want Mother there. During that visit, Mother hit Minor's legs with a belt but did not observe injuries on his legs afterwards. That was

the only time she hit Minor.  When Mother left in December 2017, she did not take Minor with her.

In 2018, Minor went to live with Father pursuant to an informal agreement between Mother and Father.  At that point, Mother stopped communicating with Linda because they were not getting along and, since Minor was with Father, there was no need for Mother to talk to Linda.  In May 2019, Linda and the maternal great-aunt tried to visit Mother in Arkansas, where she was then living, but Mother told them to leave because she did not want to talk to Linda.

When Minor was living with Father, Mother communicated with Father and Minor by phone and on Facebook.  The last time Mother talked to Minor was in August 2019 because after that Father blocked her on Facebook and she was not able to reach him.  Mother tried to communicate with Minor through a paternal uncle and Father, but she did not reach out to Linda because Mother did not have a phone number for her.

In January 2020, Mother learned where Minor was after she "finally reached out to" Minor's paternal uncle.  The paternal uncle told Mother that Father was incarcerated and Minor was in Linda's care.

*Minor's Therapist*

Minor's therapist testified she had been seeing Minor weekly since October 2019.  In June 2020, she wrote a letter to the Agency.  Statements in the letter about Mother—that Mother had abandoned Minor multiple times, Mother beat Minor in December 2017, Mother fled Linda's home to avoid being arrested, and Minor had been exposed to domestic violence when in Mother's care—were all based on information from Linda.  The therapist had never met Mother.  In the letter, the therapist opined Linda was the most secure attachment for Minor because he spent the longest amount of time

8

with her and had been returned to her care several times from both parents. That opinion was based on information from Linda as well as Minor's hospital records, a school assessment, and other records indicating Linda was the most utilized caregiver. At the time of her January 2021 testimony, the therapist's opinion was still that Minor should remain with Linda. She also believed it would be in Minor's best interest to have some sort of contact with Mother.

*Minor's Former Psychologist*

Minor's former psychologist testified she first met Minor in January 2017 at Linda's request, and met with him weekly until February 2018. In a June 2020 letter to the Agency, the psychologist relied on information from Linda in making statements about Minor's history, including that Minor had a history of trauma and neglect prior to July 2016, Minor was left alone on a porch and eating food from the garbage while in Mother's care, Minor had been left in the care of babysitters who were suspected of causing scars and bruises, and Minor had witnessed domestic violence between his parents. The psychologist did not investigate any of this reported information. However, she found Minor's behaviors consistent with a history of placement instability and neglect.

In August 2017, the psychologist met with Mother and offered suggestions for how to say goodbye to Minor when she left because, according to Linda, Mother periodically arrived for visits unexpectedly and then left unexpectedly. In December 2017, Linda told the psychologist that Mother beat Minor the previous week. The psychologist reported it to the Agency, but she did not ask Minor about it. However, in a session following this report, Minor said something to the effect of, " 'mommy spank me.' "

*Juvenile Court Ruling*

In March 2021, the juvenile court issued a lengthy and detailed ruling denying Mother's section 388 petition, finding the Agency exercised reasonable diligence in attempting to locate Mother. The court found Linda and the maternal great-aunt did not "try to create confusion or ambiguity about the whereabouts of the mother," but rather "didn't . . . really seem to know where she was." The court found the maternal uncle "not credible" in that he appeared to be "repeating something that he had been told to say." The court further found Mother not credible.

With respect to the section 366.26 permanent plan, the parties agreed to submit without presenting additional evidence. The juvenile court agreed with the Agency's recommendation of legal guardianship with Linda.

## DISCUSSION

### I. *Mother's Section 388 Petition*

"Under section 388, a parent may petition the court to change, modify, or set aside a previous court order on the grounds of changed circumstances or new evidence. (§ 388, subd. (a).) . . . [¶] A section 388 motion is a proper vehicle to raise a due process challenge based on lack of notice." (*In re Justice P.* (2004) 123 Cal.App.4th 181, 188–189.) "A ruling on a section 388 petition is 'committed to the sound discretion of the juvenile court, and the trial court's ruling should not be disturbed on appeal unless an abuse of discretion is clearly established." (*In re D.B.* (2013) 217 Cal.App.4th 1080, 1088–1089.)

#### A. *Reasonable Diligence*

##### 1. *Legal Background*

" 'Due process requires that a parent is entitled to notice that is reasonably calculated to apprise [the parent] of the dependency proceedings

10

and afford [the parent] an opportunity to object. [Citation.] The child welfare agency must act with diligence to locate a missing parent. [Citation.] Reasonable diligence denotes a thorough, systematic investigation and an inquiry conducted in good faith.' " (*In re R.A.* (2021) 61 Cal.App.5th 826, 835.) "It includes searching not only 'standard avenues available to help locate a missing parent,' but ' "specific ones most likely, under the unique facts known to the [child welfare agency], to yield [a parent's] address." ' " (*In re Daniel F.* (2021) 64 Cal.App.5th 701, 712.) " 'However, there is no due process violation when there has been a good faith attempt to provide notice to a parent who is transient and whose whereabouts are unknown for the majority of the proceedings.' " (*In re R.A.,* at p. 836.)

The following search has been held reasonable: the child welfare agency "sent a certified letter to [the mother's] last known address, contacted the post office to determine a forwarding address, and mailed a letter to the grandparents asking for help in locating [the mother]," searched various local and state databases and sent letters to the resulting addresses, "called [the mother's] last known telephone number, attempted to find a current telephone number through directory assistance, and searched the central incarceration index." (*In re Melinda J.* (1991) 234 Cal.App.3d 1413, 1416, 1418.)

In contrast, where the mother told the agency that the father had been deported to Mexico the previous year and two of the minor's older half-siblings told the agency they had contact with the father on Facebook, yet the agency searched only United States databases and failed to seek help from the half-siblings in contacting the father through Facebook, the agency's efforts to locate the father were not reasonable. (*In re D.R.* (2019) 39 Cal.App.5th 583, 587–588, 591.) The Court of Appeal reasoned, "This is

11

not a case where we have no information as to [the f]ather's whereabouts. This is a case where there were leads from cooperative family members." (*Id.* at p. 591.) Similarly, in *In re Daniel F.,* the record indicated that, when the child welfare agency first spoke to the father's sister, it did not ask her for contact information about the father, even though the father's whereabouts had been unknown for more than three months. (*In re Daniel F., supra,* 64 Cal.App.5th at pp. 705–706, 713.) Not until more than six months later did the agency talk to the father's sister about contacting the father. (*Id.* at pp. 708, 713.) The sister provided a telephone number, but when the father did not respond to two messages, the agency did not follow up until another six months passed, when the sister had the father call the agency. (*Id.* at pp. 708, 713.) Because, as in *In re D.R.,* it appeared to be " 'a case where there were leads from [a] cooperative family member' but the Agency searched only standard avenues without taking advantage of the ' "specific ones most likely, under the unique facts known to the [Agency]," ' to yield Father's contact information," the Court of Appeal held the father established an entitlement to an evidentiary hearing. (*In re Daniel F.,* at pp. 713, 717; see also *In re Mia M.* (Feb. 28, 2022, B313574) __ Cal.App.5th __ [p. 25] ["the Department failed to investigate the most likely avenues for locating father"].)

        2.    *Analysis*

Mother argues the Agency did not exercise reasonable diligence because it "fail[ed] to ask located family members for the names and locations of other relatives." Specifically, Mother argues the Agency failed to: ask the maternal great-aunt if she knew of other relatives who might be able to contact Mother, question the maternal uncle, ask either the great-aunt or uncle if they could connect with Mother on Facebook, ask Linda if any of her

12

family in Arkansas might be able to help locate Mother, ask Linda if she had contact information for Father, or ask Minor if he had contact with Mother or knew of relatives who might have contact with Mother.

The Agency repeatedly asked both Linda and the maternal great-aunt if they knew Mother's whereabouts or had any updated information. It asked Linda if any family members may have had contact with Mother. The Agency had no reason to suspect Linda or the great-aunt were concealing avenues for contacting Mother; to the contrary, in September, Linda told the Agency Mother had been calling her and gave the Agency a new phone number for Mother. Given this, it was not unreasonable for the Agency to fail to ask more pointed questions such as whether any of Linda's family in Arkansas could help locate Mother or whether the great-aunt could connect with Mother on Facebook. Instead, the Agency could reasonably assume Linda and the great-aunt would provide it with avenues to contact Mother if they knew of any. The Agency's failure to question the maternal uncle, in light of Linda's representation that he would not be of help, was not unreasonable. Nor was the Agency's failure to question Minor, who was six years old at the time the petition was filed. The evidentiary hearing did not explore the Agency's efforts to locate Father and therefore Mother's assertion that the Agency failed to ask Linda for Father's contact information is speculative. We note that in December 2019, the juvenile court found the Agency exercised due diligence in searching for Father.

This case is distinguishable from cases where the child welfare agency had reason to believe that certain avenues could help locate the missing parent yet failed to pursue them, such as *In re D.R.* and *In re Daniel F.,* discussed above. For the same reason, it is distinguishable from *In re Arlyne A.* (2000) 85 Cal.App.4th 591, relied on by Mother. In *In re Arlyne A.,*

a relative told the child welfare agency that a police report about the father included the paternal grandparents' address, yet when the agency "tried, unsuccessfully, to obtain the police report from the [sheriff's department, which took the report], the [agency] neglected the next reasonable step of seeking a copy of the report from the Colton Police Department, the actual investigating agency." (*Id.* at pp. 594–595, 597, 599.) The agency also "unreasonably limited its directory assistance search to [one city], based on the DMV's *1994* address for [the father], which was *five years old,*" and "*ignored* the more timely information supplied by both [one of the minors'] attorney and [the maternal grandmother] that [the father's] parents were living in [another city]." (*Id.* at pp. 598–599.) Here, in contrast, the Agency did not have specific leads that it ignored.

Mother also relies on a statute and related rule requiring agencies to identify and locate a minor's adult relatives. (§ 309, subd. (e)(1) ["If the child is removed, the social worker shall conduct, within 30 days, an investigation in order to identify and locate all grandparents, parents of a sibling of the child, if the parent has legal custody of the sibling, adult siblings, other adult relatives of the child" and explain "the various options to participate in the care and placement of the child and support for the child's family, including any options that may be lost by failing to respond"]; Cal. Rules of Court, rule 5.695(e)–(f).) As an initial matter, Mother has not provided record citations demonstrating that she raised any objection on this ground below, and the ground was not raised in her section 388 motion or supporting memorandum. (*Avalos v. Perez* (2011) 196 Cal.App.4th 773, 776 ["As a general rule, a claim of error will be deemed to have been forfeited when a party fails to bring the error to the trial court's attention by timely motion or objection."].) In any event, the apparent purpose of the statute is to notify relatives of their

14

options to participate in the child's care and placement, not to locate parents, and Mother fails to provide authority that this statute is relevant to the Agency's reasonable diligence in locating her.

In sum, the juvenile court did not abuse its discretion in finding the Agency exercised reasonable diligence in attempting to locate Mother.[8]

B.     *Failure to Appoint Counsel*

Mother separately argues her due process rights were violated by the juvenile court's failure to appoint counsel for her at the jurisdiction/disposition hearing.[9]  Had counsel been appointed, she contends, counsel could have challenged the sufficiency of the petition's allegations, the sufficiency of the evidence supporting those allegations, and the sufficiency of the evidence supporting bypass of reunification services.

Mother cites no authority that a parent whose whereabouts are unknown and who the Agency, after exercising reasonable diligence, is unable to locate, has a due process right to counsel.  We note that in published reasonable diligence cases, counsel is appointed after the parent's

---

[8] Because of this conclusion, we need not decide the Agency's contention that Mother failed to establish granting the petition would be in Minor's best interest.  We note courts have held that "when a section 388 petition is based on lack of notice, a separate showing of best interest is not required." (*In re R.A., supra,* 61 Cal.App.5th at pp. 836–837; but see *In re Justice P., supra,* 123 Cal.App.4th at p. 192 ["we reject the notion that every section 388 petition based on a notice violation merits an evidentiary hearing as a matter of law regardless of whether there is a prima facie showing that the best interests of the child will be promoted"].)

[9] Mother does not contend her statutory rights were violated.  We note the applicable statute "requires the indigent parent to communicate in some fashion his or her desire for representation before the juvenile court is obligated to appoint counsel." (*In re Ebony W.* (1996) 47 Cal.App.4th 1643, 1647.)

15

whereabouts become known.  (See *In re Daniel F., supra,* 64 Cal.App.5th at p. 709; *In re R.A., supra,* 61 Cal.App.5th at p. 832; *In re D.R., supra,* 39 Cal.App.5th at p. 589; *In re Justice P., supra,* 123 Cal.App.4th at p. 187.) Indeed, we fail to see how counsel could represent a client with whom counsel had never communicated, having no ability to determine the client's objectives.  (Cal. Juvenile Dependency Practice (Cont.Ed.Bar 2020) § 11.54 ["The decision to deny the allegations of the petition and to set a contested jurisdictional hearing is ultimately up to the parent."]; Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2021) § 2.61 ["the parent's lawyer must abide by the client's informed decision concerning the objectives of representation"].)  Mother has failed to establish a due process violation on this ground.

II.    *Evidentiary Rulings*

Mother challenges the juvenile court's exclusion of evidence on relevance grounds and the court's refusal to take judicial notice of certain court records.  We reject the challenges.

A.    *Legal Background*

"To be relevant, evidence must have some 'tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.'  (Evid. Code, § 210.) . . . [¶] Conversely, a matter is 'collateral' if it has no logical bearing on any material, disputed issue."  (*People v. Contreras* (2013) 58 Cal.4th 123, 152.)  We review the juvenile court's relevancy determinations for abuse of discretion.  (*People v. Jones* (2017) 3 Cal.5th 583, 609.)

Judicial notice "may" be taken of "[r]ecords of . . . any court of this state . . . ."  (Evid. Code, § 452, subd. (d).)  Judicial notice "shall" be taken of such

16

records if sufficient notice is given to adverse parties and sufficient information is provided to the court. (Evid. Code, § 453.)

"To the extent an alleged error violates state evidentiary law, 'even where evidence is improperly excluded, the error is not reversible unless " 'it is reasonably probable a result more favorable to the appellant would have been reached absent the error.' " ' " (*In re Jordan R.* (2012) 205 Cal.App.4th 111, 134.)

B.      *Reason For Mother's Return to Foster Care*

Mother testified that when she was 16 years old, after living with Linda for 10 years, she returned to foster care until Linda "got me back" in Mother's senior year of high school. Mother's counsel asked about "the reason" Mother returned to foster care and, after the Agency objected on relevance grounds, made an offer of proof that the testimony would "go[] to the motivation and the history why -- some of the things that we've heard, inconsistencies from the other witnesses and that Linda had told the [Agency] regarding [Mother] . . . ." The juvenile court sustained the objection.

Mother does not contend the excluded evidence was relevant to whether the Agency exercised reasonable diligence, but argues it was relevant to whether Minor should be returned to her care and whether she should be granted visitation. Assuming those issues were before the juvenile court at the time the testimony was proffered, the claim fails. First, Mother's offer of proof was insufficient. "A proper offer of proof must ' "set forth the actual evidence to be produced"' and the ' " 'substance, purpose, and relevance of the . . . evidence.' " ' [Citations.] A 'vague and nebulous' offer of proof as to what testimony would be elicited from the witness is not sufficient." (*In re A.G.* (2020) 58 Cal.App.5th 973, 997.) In addition, Mother has not demonstrated any error was prejudicial. There was other evidence

17

that Mother and Linda did not get along.  Mother has not shown that admitting testimony of some years-ago dispute—after which they reconciled sufficiently for Mother to move back in with Linda and later leave Minor in Linda's care—was reasonably probable to have resulted in a more favorable outcome.

C.     *Mother's Communication With Relatives in August 2019*

Mother's counsel asked Mother whether Mother was in communication with Linda's sister in August 2019.  When the Agency objected on relevance grounds, Mother's counsel made an offer of proof that there was previous testimony Linda was in contact with her sister, and argued evidence that Mother was in contact with Linda's sister would bear on whether the Agency exercised reasonable diligence.  The juvenile court sustained the objection. Mother's counsel then asked whether Mother was in communication with Mother's sister in August 2019, and the same objection was raised and sustained.

The juvenile court did not abuse its discretion in finding evidence that Mother was in communication with various relatives unknown to the Agency was not relevant to the issue of whether the Agency exercised reasonable diligence.  Even if the ruling were in error, Mother fails to demonstrate prejudice: there was already evidence that Mother could have been reached through either Mother's sister or through Linda's sister, by way of Mother's sister.  It is not reasonably probable that the admission of evidence that Mother was directly in communication with these relatives would have resulted in a more favorable outcome.

D.    *Judicial Notice of Father's Criminal Records*

Mother requested judicial notice of the minutes of a June 2019 hearing in a criminal case indicating Father was placed on probation for three years. The trial court denied the request.

Assuming the juvenile court erred in refusing to take judicial notice of the records, Mother has failed to demonstrate prejudice. Mother argues the court records state Father was required to report any address changes as a condition of his probation and therefore a search of court records would likely have resulted in an updated address for Father. Of course, just because a probationer is required to report address changes does not mean the probationer actually does so. Notably, Mother did not request judicial notice of any subsequent court records indicating Father had provided an updated address. The Agency searched numerous databases and attempted to contact Father at various addresses, but received no response. It is not reasonably probable judicial notice of the minute order would have resulted in a more favorable outcome.

III.    *Visitation*

A.    *Additional Background*

At the detention hearing, when Mother's whereabouts were still unknown, the court ordered no visitation "at this time." No orders regarding visitation with Mother were made at jurisdiction/disposition. Mother testified that, after she contacted the Agency in January 2020, the Agency told her not to contact Minor. During the section 388 proceedings, Mother made requests for visitation at various times, which the juvenile court denied because Mother had not demonstrated changed circumstances and the case was in an ongoing contest.

19

At the March 2021 hearing, after the juvenile court denied Mother's section 388 petition and before it proceeded to the section 366.26 permanent plan, Mother requested therapeutic visitation. Mother argued that Minor's therapist had testified it would be in Minor's best interest to have some sort of contact with Mother. The Agency stated it was "open to discretion for therapeutic visits," but noted Minor had recently been having concerning behaviors, possibly related to a recent trip, and the Agency wanted "input from the therapist as to how to go about even starting, say, therapeutic visits and when that would be a good time, given this minor's state, and given how long a length of time it has been since he has had contact with the mother." The position of Minor's counsel was that "the therapist should weigh in on the particulars of starting."

The juvenile court ruled, "The Agency will be afforded discretion to initiate therapeutic visitation between the mother and [Minor] upon their gathering information from the child's therapist, and what sort of setup or schedule would be in the child's best interest, if instituting therapeutic visits would be in the child's best interest at this time." Later at the same hearing, when setting the section 366.26 permanent plan, the juvenile court found visitation with Mother would be detrimental to Minor's physical or emotional well-being. The court expressly declined to change the detriment finding, despite granting the Agency discretion to start therapeutic visitation.

B.    *Analysis*

Mother argues the juvenile court's detriment finding lacks substantial evidence.[10]  (See § 366.26, subd. (c)(4)(C) [when juvenile court orders

---

[10] In a footnote, Mother also asserts granting discretionary authority to the Agency "appears to violate the statutory scheme and separation of powers

permanent plan of guardianship, it "shall also make an order for visitation with the parents . . . unless the court finds by a preponderance of the evidence that the visitation would be detrimental to the physical or emotional well-being of the child"].) We agree.

There is no evidence Minor's recent behavioral concerns noted by the Agency have any relation to Mother; to the contrary, Minor has had no contact with Mother since August 2019. That Minor became upset when the subject of Mother came up in April 2020—nearly a year before the detriment finding—is not sufficient evidence to support the finding. Minor's therapist testified contact with Mother would be in Minor's best interest. The concerns raised by the Agency and Minor's counsel at the hearing appeared to center more around ensuring that the mechanics of visitation took Minor's needs into account. Indeed, at the same time as the juvenile court found visitation would be detrimental, it authorized the Agency to start visitation. Granting this authority to the Agency appears inconsistent with the court's detriment finding, or at the least undermines it. As the Agency notes on appeal, "Visitation to Mother was not entirely denied." Accordingly, we reverse the detriment finding.

Mother asks this court to direct the juvenile court to order visitation on remand. We decline to do so. "[T]he family's circumstances may well have changed" since the visitation order, therefore, in reconsidering the issue on remand, "the court should consider any relevant evidence proffered by the parties . . . ." (*In re T.H.* (2010) 190 Cal.App.4th 1119, 1124.)

---

doctrine." However, she concedes the issue was not raised below and does not pursue it on appeal.

21

IV. *Judicial Bias*

In issuing its order denying Mother's section 388 petition, the juvenile court made the following finding: "I have found the mother not credible. I found her to be, as many people would, deeply traumatized by the idea of her child being in foster care, and not desirous of an outcome of a termination of parental rights or legal guardianship. And therefore that she would seek to sort of look back in time and try to point out all of the deficiencies in the agency's efforts. [¶] I don't fault the mother. But she is looking back with hindsight 2020 and trying to illustrate through her testimony and declaration why she was basically standing in broad daylight and could easily have been found if the agency had made further effort. [¶] And I don't think this state of the evidence supports that." Mother argues this finding was not supported by substantial evidence and, therefore, the finding is evidence of judicial bias in violation of her right to due process. Mother asks this court to remand for proceedings before a "neutral judicial officer."

This contention is entirely meritless. As an initial matter, "We may not substitute our assessment of the credibility of a witness in place of the credibility assessment of the trial court," or reverse based on credibility arguments unless the testimony "was physically impossible or . . . patently false on its face." (*In re Ana C.* (2012) 204 Cal.App.4th 1317, 1329.) Mother has not met this high burden. Moreover, "the due process clause should not be routinely invoked as a ground for judicial disqualification. Rather, it is the exceptional case presenting extreme facts where a due process violation will be found." (*People v. Freeman* (2010) 47 Cal.4th 993, 1005.) This is not even close to being such case.

## DISPOSITION

The juvenile court's order finding visitation with Mother would be detrimental to Minor is reversed and the matter is remanded. The court's orders are otherwise affirmed.

 

_____

SIMONS, Acting P. J.

We concur.

_____

NEEDHAM, J.

_____

BURNS, J.

(A162267)