[No. S150984. Jan. 21, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
MARILYN KAYE FREEMAN, Defendant and Appellant.

In re MARILYN KAYE FREEMAN on Habeas Corpus.

## COUNSEL

Carl M. Hancock, under appointment by the Supreme Court, for Defendant and Appellant and for Petitioner.

Marilyn Kaye Freeman, in pro. per., for Petitioner.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson and Dane R. Gillette, Chief Assistant Attorneys General, Gary W. Schons, Assistant Attorney General, Donald E. De Nicola, Deputy State Solicitor General, Pamela Ratner Sobeck, Steven T. Oetting and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**MORENO, J.**—We granted review in this case to determine whether the appearance of bias by a judge requires recusal under the due process clause of the federal Constitution. (U.S. Const., 14th Amend.) While this matter was pending the United States Supreme Court filed its opinion in *Caperton v. A. T. Massey Coal Co.* (2009) 556 U.S. ___ [173 L.Ed.2d 1208, 129 S.Ct. 2252]. The court's exhaustive review of its jurisprudence in this delicate realm of constitutional law compels the following conclusions: while a showing of actual bias is not required for judicial disqualification under the due process clause, neither is the mere appearance of bias sufficient. Instead, based on an objective assessment of the circumstances in the particular case, there must exist " 'the probability of actual bias on the part of the judge or decision-maker [that] is too high to be constitutionally tolerable.' " (556 U.S. at p. ___ [129 S.Ct. at p. 2259].) Where only the appearance of bias is at issue, a litigant's recourse is to seek disqualification under state disqualification statutes: "Because the codes of judicial conduct provide more protection than due process requires, most disputes over disqualification will be resolved without resort to the Constitution." (556 U.S. at p. ___ [129 S.Ct. at p. 2267].) Finally, the court emphasized that only the most "extreme facts" would justify judicial disqualification based on the due process clause. (*Id.* at pp. ___, ___ [129 S.Ct. at pp. 2265, 2266].)

The Court of Appeal held that the circumstances of this case required the trial judge to recuse himself and his failure to do so violated defendant Marilyn Kaye Freeman's due process rights. We conclude, however, in light of *Caperton*, that this case does not present the "extreme facts" that require judicial disqualification on due process grounds. Accordingly, we reverse the judgment of the Court of Appeal.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Facts

The facts underlying defendant's offenses were succinctly summarized by the Court of Appeal: "On September 10, 2002, [defendant's] 14-year-old daughter (E.) called the police reporting that her mother had assaulted her that day and had been doing so on a regular basis. E. was removed from her home and placed in a foster home. [Defendant], an attorney, then engaged in an aggressive campaign to disrupt the foster placement and terrorize her daughter's foster parents in a misguided attempt to monitor and reunite with her daughter. [Defendant] solicited one of her clients to kidnap E. from the foster parents, burglarized the foster parents' home, chased the foster parents at high speeds on the freeway, followed them in her car on city streets, glared

at them 'in [an] evil manner' when she was spotted, spied on them at their residence and elsewhere, took pictures of them, and sprayed her perfume in their vehicle.

"The jury found [defendant] guilty of solicitation to commit kidnapping, residential burglary, stalking, and misdemeanor child endangerment and battery. She was sentenced to prison for six years."

### B. Procedural Background

On the morning of December 19, 2002, defendant, then in custody, appeared before Judge Robert O'Neill for a hearing pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44], in which she sought to replace her court-appointed counsel. After the court granted her motion, the issue of bail arose. Judge O'Neill said he would set the matter for bail review before another judge. After some further colloquy, defendant said, "I was wanting to bring up at that hearing the possibility of house arrest there is [*sic*] rumors that are not really charges that I have been stalking poor Judge Elias." (Judge Elias was the judge presiding over the dependency court proceeding involving defendant and her daughter.)

Judge O'Neill replied that he was aware of the "allegation," and commented, "Judge Elias and I worked together in the District Attorney's office. I have known Judge Elias for 23 years. He is a friend of mine, and that is another reason I want to set the bail review back in front of Judge Szumowski who originally set bail. [¶] There is no good cause to change bail, and I really think based on what I have been told I would recuse myself from the bail issue."

After further discussion on scheduling matters, defendant again raised the bail issue, telling the court she had been advised at arraignment to seek bail review before someone other than Judge Szumowski. Judge O'Neill told her she should discuss the situation with her newly appointed counsel "in light of the allegations made—just made concerning Judge Elias. In that situation a judge who is not a member of the bench should hear a bail review. That would be a retired judge or a judge sitting on assignment." Defendant observed that Judge Elias had not recused himself because "he made it clear he doesn't think there is any substance to those allegations," and said, "Do you think in lieu of all this craziness if I—that just house arrest would be a good idea?" The court replied, in part, "What I am doing as to your bail motion, I am recusing myself. I don't think I'm the person that should hear it."

Between January 6, 2003, and September 3, 2003, various judges of the San Diego Superior Court—excluding Judge O'Neill—presided over hearings

in defendant's case related to appointment of counsel, bail review, discovery, and other matters. On September 3, 2003, defendant's case was assigned to retired Judge Charles Jones for all purposes. Judge Jones presided over defendant's preliminary hearing and bound her over for trial.

At a May 14, 2004 status conference, Judge Jones stated on the record that there was a discussion in chambers about why the matter had been assigned to him. "And the district attorney has advised me of how and why that came about and the reason. The reason no longer exists, and it does not look like there's been a recusal of the San Diego County Superior Court, so I will put another couple of other matters on the record and transfer the matter back to [Judge Deddeh]."

Later that day, Judge Deddeh explained, "With regard to the recusal issue, it is my understanding that it was communicated to Judge Jones that the only reason the bench was being recused is because there is a possibility that on . . . [defendant's] computer . . . there was some indication that she was stalking Judge Elias. Apparently the computer has been reviewed. . . . And . . . apparently [Judge Elias is] not a victim in this case. And so there is apparently no reason for the bench to recuse itself." Ultimately, Judge Deddeh reassigned the case to Judge O'Neill. Defendant reminded the court that "he already recused himself. He recused himself because he is a good friend of Judge Elias." Judge Deddeh replied, "He can do that when I send it up there." Defendant said, "Okay." Judge Deddeh added, "We'll see whether or not this is going to be an issue for him." When the case reached Judge O'Neill that day, defendant filed a handwritten challenge to him in which her counsel did not join. No action was taken on the challenge on that day.

The May 20, 2004 minute order for Judge O'Neill's department states that the matter was sent back to Judge Deddeh for reassignment that morning but does not reflect what discussion led to this action. Judge Deddeh declined to consider the disqualification motion on the ground that it was not filed by defendant's counsel and returned the case to Judge O'Neill. In Judge O'Neill's court, defendant evidently withdrew her challenge. Judge O'Neill returned the matter to Judge Deddeh "for a record to be made re: withdrawal of challenge and assignment back to [Judge O'Neill]." Back in Judge Deddeh's court, Judge Deddeh asked defense counsel, "All right. So with regard to the [Code of Civil Procedure section] 170.1 challenge . . . is your client withdrawing her 170.1 challenge?" Defense counsel answered, "Yes, Your Honor." The court then posed the same question to defendant: "All right. So then is that right, Miss Freeman, you are withdrawing that?" Defendant replied, "Yes, Your Honor." Judge Deddeh then reassigned the case to Judge O'Neill.

On October 18, 2004, the day of trial, during a hearing on another *Marsden* motion, defendant again sought to disqualify Judge O'Neill for cause. Defendant claimed she had been "bullied" by her attorneys into keeping Judge O'Neill but that she believed that he "was personally prejudiced; and I always have because you told me that in December of 2002." The court responded, "Ms. Freeman, you withdrew your challenge in front of Judge Deddeh." After the court denied her *Marsden* motion, defendant again claimed the court was "prejudiced" against her and said, "I don't believe that once you recused yourself for cause that there was any possible way for that to be overridden." The court responded, "Ms. Freeman, that has been ruled upon."

The matter proceeded to trial and defendant was convicted and sentenced as noted.

The Court of Appeal reversed defendant's conviction on the ground that defendant's due process rights were violated by Judge O'Neill's failure to disqualify himself when the case was reassigned to him.[1] We granted the Attorney General's petition for review.

## II. ANALYSIS

### A. Statutory Forfeiture of Claim

Before we reach the constitutional issue, we must dispose of a preliminary matter: whether defendant forfeited any claim that her statutory right to disqualify a judge for bias, either actual or apparent, was violated in this case. The statutory basis for disqualifying judges is set forth in Code of Civil Procedure section 170.1, and other sections outline the procedures for determining the motion and the effect of the disqualification.

█ Relevant here are two provisions contained in Code of Civil Procedure section 170.3. Subdivision (a)(1) states that, upon recusal, the recused judge "shall not further participate in the proceeding, except as provided in Section 170.4, unless his or her disqualification is waived by the parties as provided

---

[1] While her appeal was pending in the Court of Appeal, defendant filed a writ of habeas corpus in propria persona in which she alleged that appellate counsel incompetently argued the judicial bias issue on appeal. The Court of Appeal consolidated the two matters. In light of its reversal of the judgment, the Court of Appeal found it unnecessary to reach the ineffective assistance claim and for that reason alone denied the petition. Defendant did not renew her claim in this court. Accordingly, we will vacate the denial of the petition for the Court of Appeal to consider the petition on its merits in light of our opinion.

in subdivision (b)."[2] Subdivision (d) provides in part: "The determination of the question of the disqualification of a judge is not an appealable order and may be reviewed only by a writ of mandate from the appropriate court of appeal sought only by the parties to the proceeding." (§ 170.3, subd. (d).) "Under our statutory scheme, a petition for writ of mandate is the *exclusive* method of obtaining review of a denial of a judicial disqualification motion." (*People v. Mayfield* (1997) 14 Cal.4th 668, 811 [60 Cal.Rptr.2d 1, 928 P.2d 485], italics added.)

Defendant filed two statutory disqualification motions against Judge O'Neill, one on May 14, 2004, and again on October 18, 2004. She withdrew the first motion. As to the latter motion, defendant asserted both that Judge O'Neill was biased against her and that, having once recused himself from her case, "I don't believe . . . that there was any possible way for that to be overridden." Judge O'Neill responded that her motion had been disposed of when she withdrew the earlier motion and, in effect, denied the October 18 motion.

Defendant's failure to seek writ review of that denial forfeits both of her potential statutory claims: that Judge O'Neill should have been disqualified for cause and that, having once recused himself, he was *statutorily* precluded from accepting reassignment of the case. (See *Geldermann, Inc. v. Bruner* (1991) 229 Cal.App.3d 662, 665 [280 Cal.Rptr. 264] ["The statutes, however, do not permit limited, partial or conditional recusal . . . ."].) Accordingly, we address the issue of judicial disqualification solely under the rubric of due process. (*People v. Chatman* (2006) 38 Cal.4th 344, 362 [42 Cal.Rptr.3d 621, 133 P.3d 534].)

## B. Due Process Violation

■ We now turn to the issue on which review was granted: does the due process clause require judicial disqualification based on the mere appearance of bias. "A fair trial in a fair tribunal is a basic requirement of due process." (*In re Murchison* (1955) 349 U.S. 133, 136 [99 L.Ed. 942, 75 S.Ct. 623].) "The Supreme Court has long established that the Due Process Clause guarantees a criminal defendant the right to a fair and impartial judge." (*Larson v. Palmateer* (9th Cir. 2008) 515 F.3d 1057, 1067.) The operation of the due process clause in the realm of judicial impartiality, then, is primarily to protect the individual's right to a fair trial. In contrast to this elemental goal, a statutory disqualification scheme, like that found in our Code of Civil Procedure, is not *solely* concerned with the rights of the parties before the

---

[2] Code of Civil Procedure section 170.4, subdivision (a) permits the recused judge to perform a limited number of tasks.

court but is also "intended to ensure public confidence in the judiciary." (*Curle v. Superior Court* (2001) 24 Cal.4th 1057, 1070 [103 Cal.Rptr.2d 751, 16 P.3d 166].)[3] Thus, an explicit ground for judicial disqualification in California's statutory scheme is a public perception of partiality, that is, the appearance of bias. (Code Civ. Proc., § 170.1, subd. (a)(6)(A)(iii); *Christie v. City of El Centro* (2006) 135 Cal.App.4th 767, 776 [37 Cal.Rptr.3d 718] ["Disqualification is mandated if a reasonable person would entertain doubts concerning the judge's impartiality."].)

By contrast, the United States Supreme Court's due process case law focuses on actual bias. This does not mean that actual bias must be proven to establish a due process violation. Rather, consistent with its concern that due process guarantees an impartial adjudicator, the court has focused on those circumstances where, even if actual bias is not demonstrated, the probability of bias on the part of a judge is so great as to become "constitutionally intolerable." (*Caperton v. A. T. Massey Coal Co., supra,* 556 U.S. at p. ___ [129 S.Ct. at p. 2262] (*Caperton*).) The standard is an objective one.

*Caperton* both reviewed the court's jurisprudence in this area and extended it. The issue in *Caperton* was whether due process was violated by a West Virginia high court justice's refusal to recuse himself from a case involving a $50 million damage award against a coal company whose chairman had contributed $3 million to the justice's election campaign. The justice cast the deciding vote that overturned the award. The United States Supreme Court held that, under the "extreme facts" of the case, "the probability of actual bias rises to an unconstitutional level." (*Caperton, supra,* 556 U.S. at p. ___ [129 S.Ct. at p. 2265].)

As the *Caperton* court noted, in the high court's first foray into this area in *Tumey v. Ohio* (1927) 273 U.S. 510 [71 L.Ed. 749, 47 S.Ct. 437], it had "concluded that the Due Process Clause incorporated the common-law rule that a judge must recuse himself when he has 'a direct, personal, substantial, pecuniary interest' in a case." (*Caperton, supra,* 556 U.S. at p. ___ [129 S.Ct. at p. 2259].) *Caperton* observed, however, that "new problems have emerged that were not discussed at common law" leading it to identify "additional instances which, as an objective matter, require recusal." (*Ibid.*) *Tumey* itself was such a case. *Tumey* involved a mayor-judge authorized to conduct court trials of those accused of violating a state alcoholic beverage prohibition law; if a defendant was found guilty, a percentage of his fine was paid to the mayor and the rest was paid to the village's general treasury. The court held that the system violated the defendant's due process rights even assuming that the mayor-judge's direct pecuniary interest would not have influenced his

---

[3] Of course, the two goals are not unrelated and the due process guarantee of an impartial adjudicator would necessarily instill public confidence in the judicial system.

decision. "The [*Tumey*] Court articulated the controlling principle: [¶] 'Every procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law.' " (*Caperton*, at p. ___ [129 S.Ct. at p. 2260].)

The *Caperton* court observed that, even in that early case, the high court was "concerned with more than the traditional common-law prohibition on direct pecuniary interest. It was also concerned with a more general concept of interests that tempt adjudicators to disregard neutrality." (*Caperton, supra*, 556 U.S. at p. ___ [129 S.Ct. at p. 2260].) The court in *Caperton* reviewed two of its other decisions implicating indirect pecuniary interests that in its view tested the neutrality of the adjudicators in those cases. *Ward v. Village of Monroeville* (1972) 409 U.S. 57 [34 L.Ed.2d 267, 93 S.Ct. 80] involved another mayor-judge, but in that case the mayor's compensation was not tied to his adjudications. Rather, "the fines the mayor assessed went to the town's general fisc." (*Caperton, supra*, 556 U.S. at p. ___ [129 S.Ct. at p. 2260].) Nonetheless, the *Monroeville* court found the procedure to violate due process because of the " ' "possible temptation" ' " the mayor might face to maximize the town's revenues at the expense of defendants appearing before him. (*Caperton*, at p. ___ [129 S.Ct. at p. 2260].)

Finally, in *Aetna Life Insurance Co. v. Lavoie* (1986) 475 U.S. 813 [89 L.Ed.2d 823, 106 S.Ct. 1580], the court "further clarified the reach of the Due Process Clause regarding a judge's financial interest in a case. There, a justice had cast the deciding vote on the Alabama Supreme Court to uphold a punitive damages award against an insurance company for bad-faith refusal to pay a claim. At the time of his vote, the justice was the lead plaintiff in a nearly identical lawsuit pending in Alabama's lower courts. His deciding vote, this Court surmised, 'undoubtedly "raised the stakes" ' for the insurance defendant in the justice's suit. [Citation.] [¶] The Court stressed that it was 'not required to decide whether in fact [the justice] was influenced.' [Citation.] The proper constitutional inquiry is 'whether sitting on the case then before the Supreme Court of Alabama " 'would offer a possible temptation to the average . . . judge to . . . lead him not to hold the balance nice, clear and true.' " ' [Citation.] The Court underscored that 'what degree or kind of interest is sufficient to disqualify a judge from sitting "cannot be defined with precision." ' [Citation.] In the Court's view, however, it was important that the test have an objective component." (*Caperton, supra*, 556 U.S. at pp. ___–___ [129 S.Ct. at pp. 2260–2261].)

The *Caperton* court then examined another line of cases in which the court had found that the probability of actual bias was so high as to require recusal

under the due process clause. "The second instance requiring recusal that was not discussed at common law emerged in the criminal contempt context, where a judge had no pecuniary interest in the case but was challenged because of a conflict arising from his participation in an earlier proceeding." (*Caperton, supra*, 556 U.S. at p. ___ [129 S.Ct. at p. 2261].) That case, *In re Murchison, supra*, 349 U.S. 133, involved a judge who presided over the contempt trial of two witnesses whom the same judge had charged with contempt following his examination of them at a proceeding to determine whether to file criminal charges—a so-called " ' "one-man grand jury." ' " (*Caperton, supra*, 556 U.S. at p. ___ [129 S.Ct. at p. 2261], quoting *In re Murchison, supra*, 349 U.S. at p. 133.)

As *Caperton* explained, the *Murchison* court set aside the contempt convictions "on grounds that the judge had a conflict of interest at the trial stage because of his earlier participation followed by his decision to charge them. . . . The [*Murchison*] Court recited the general rule that 'no man can be a judge in his own case,' adding that 'no man is permitted to try cases where he has an interest in the outcome.' [Citation.] [*Murchison*] noted that the disqualifying criteria 'cannot be defined with precision. Circumstances and relationships must be considered.' [Citation.] These circumstances and the prior relationship required recusal: 'Having been part of [the one-man grand jury] process a judge cannot be, in the very nature of things, wholly disinterested in the conviction or acquittal of those accused.' [Citation.]" (*Caperton, supra*, 556 U.S. at p. ___ [129 S.Ct. at p. 2261].)

The *Caperton* court then turned to another decision in this line of cases—*Mayberry v. Pennsylvania* (1971) 400 U.S. 455 [27 L.Ed.2d 532, 91 S.Ct. 499]—which held that " 'by reason of the Due Process Clause of the Fourteenth Amendment a defendant in criminal contempt proceedings should be given a public trial before a judge other than the one reviled by the contemnor.' " (*Caperton, supra*, 556 U.S. at p. ___ [129 S.Ct. at p. 2262], quoting *Mayberry v. Pennsylvania, supra*, 400 U.S. at p. 466.) In so holding, however, the *Mayberry* court had "considered the specific circumstances presented" and was not propounding a general rule that " 'every attack on a judge . . . disqualifies him from sitting.' " (*Caperton*, 556 U.S. at p. ___ [129 S.Ct. at p. 2262]; see *Ungar v. Sarafite* (1964) 376 U.S. 575 [11 L.Ed.2d 92, 184 S.Ct. 841].) Rather, "[t]he inquiry is an objective one. The Court asks not whether the judge is actually, subjectively biased, but whether the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.' " (*Caperton, supra*, 556 U.S. at p. ___ [129 S.Ct. at p. 2262].)

The *Caperton* court then applied the principles derived from these cases to the issue before it—the impact of campaign contributions on judicial impartiality—acknowledging that its prior cases had not addressed this circumstance. Noting that the West Virginia justice's rejection of the petitioners' disqualification motion was based on his conclusion that he harbored no actual bias, the court said: "We do not question his subjective findings of impartiality and propriety. Nor do we determine whether there was actual bias." (*Caperton, supra*, 556 U.S. at p. ___ [129 S.Ct. at p. 2263].) Rather, the court suggested, the inherent subjectivity involved in an individual judge's examination of his or her own bias "simply underscore[s] the need for objective rules. . . . In lieu of exclusive reliance on that personal inquiry, or on appellate review of the judge's determination respecting actual bias, the Due Process Clause has been implemented by objective standards that do not require proof of actual bias. [Citations.] In defining these standards the Court has asked whether, 'under a realistic appraisal of psychological tendencies and human weakness,' the interest 'poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.' [Citation.]" (*Ibid.*)

Emphasizing that the case before it was "exceptional," the court concluded that "there is a serious risk of actual bias—based on objective and reasonable perceptions—when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent." (*Caperton, supra*, 556 U.S. at pp. ___–___ [129 S.Ct. at pp. 2263–2264].) In so concluding, the court focused on the relative size of the contribution in relation to the total amount spent on the campaign—it was larger than the amount spent by all other contributors and 300 percent greater than that spent by the campaign committee—and the "temporal relationship between the campaign contributions, the justice's election, and the pendency of the case . . . . It was reasonably foreseeable, when the campaign contributions were made, that the pending case would be before the newly elected justice." (*Id.* at pp. ___–___ [129 S.Ct. at pp. 2264–2265].) The court concluded: "On these extreme facts the probability of actual bias rises to an unconstitutional level." (*Id.* at p. ___ [129 S.Ct. at p. 2265].)

In deflecting the assertion by the respondent coal company that its ruling would open a floodgate of due-process-based recusal motions, the *Caperton* court again emphasized the exceptional nature of the cases in which it had been compelled to conclude that the due process clause had been violated by a judge's failure to recuse himself. "In each case the Court dealt with extreme facts that created an unconstitutional probability of bias that ' "cannot be defined with precision." ' [Citation.] Yet the Court articulated an objective standard to protect the parties' basic right to a fair trial in a fair tribunal. The Court was careful to distinguish the extreme facts of the cases before it from

those interests that would not rise to a constitutional level. [Citations.]" (*Caperton, supra*, 556 U.S. at pp. ___, ___ [129 S.Ct. at pp. 2265–2266].) As the court also observed, the states have moved to adopt judicial conduct codes to eliminate "even the appearance of partiality" (*id.* at p. ___ [129 S.Ct. at p. 2266]), and these codes comprise " 'standards more rigorous than due process requires' " (*id.* at p. ___ [129 S.Ct. at p. 2267]). The court, reiterating that the due process clause provides the " 'constitutional floor' " in matters involving judicial disqualification concluded: "Because the codes of judicial conduct provide more protection than due process requires, most disputes over disqualification will be resolved without resort to the Constitution. Application of the constitutional standard implicated in this case will thus be confined to rare instances." (556 U.S. at p. ___ [129 S.Ct. at p. 2267].)

■ The rule of judicial disqualification limned in *Caperton* may be complex but its application is limited. According to the high court, the protection afforded a litigant under the due process clause in the realm of judicial disqualification extends beyond the narrow common law concern of a direct, personal, and substantial pecuniary interest in a case to "a more general concept of interests that tempt adjudicators to disregard neutrality." (*Caperton, supra*, 556 U.S. at p. ___ [129 S.Ct. at p. 2260].) Where such interests are present, a showing of actual bias is not required. "The Court asks not whether the judge is actually, subjectively biased, but whether the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.' " (*Id.* at p. ___ [129 S.Ct. at p. 2262].) Moreover, the court has said that " 'what degree or kind of interest is sufficient to disqualify a judge from sitting "cannot be defined with precision." ' " (*Id.* at p. ___ [129 S.Ct. at p. 2261].) Nonetheless, the court has also made it abundantly clear that the due process clause should not be routinely invoked as a ground for judicial disqualification. Rather, it is the exceptional case presenting extreme facts where a due process violation will be found. (556 U.S. at p. ___ [129 S.Ct. at p. 2267].) Less extreme cases—including those that involve the mere appearance, but not the probability, of bias— should be resolved under more expansive disqualification statutes and codes of judicial conduct. (*Ibid.*)

In supplemental briefing regarding the impact of *Caperton* on this case, defendant argues that the facts here may present the kind of extreme case that implicates the due process clause. Defendant cites the Court of Appeal's analysis in which it concluded that Judge O'Neill's friendship with Judge Elias, and the similarity between the stalking charges against defendant and the allegation that she had stalked Judge Elias, were "consistent with what one would typically associate with actual bias." She also maintains that Judge O'Neill's acceptance of reassignment of her case after he had once recused himself constitutes unprecedented and extreme circumstances that may present a due process violation. At minimum, she requests that her case be

remanded to the Court of Appeal for a determination of whether the probability of actual bias on Judge O'Neill's part was constitutionally intolerable.

We reject defendant's arguments. This case does not implicate any of the concerns—pecuniary interest, enmeshment in contempt proceedings, or the amount and timing of campaign contributions—which were the factual bases for the United States Supreme Court's decisions in which it found that due process required judicial disqualification. While it is true that dicta in these decisions may foreshadow other, as yet unknown, circumstances that might amount to a due process violation, that dicta is bounded by repeated admonitions that finding such a violation in this sphere is extraordinary; the clause operates only as a "fail-safe" and only in the context of extreme facts.

 In this case, defendant had a statutory remedy to challenge Judge O'Neill's refusal to disqualify himself and failed to pursue it. Having forfeited that remedy, she cannot simply fall back on the narrower due process protection without making the heightened showing of a probability, rather than the mere appearance, of actual bias to prevail. We also reject defendant's claim that Judge O'Neill's acceptance of her case after he had once recused himself presents the kind of exceptional facts that demonstrate a due process violation. At most, Judge O'Neill's decision to accept reassignment of defendant's case may have violated the judicial disqualification statutes that limit the actions that may be taken by a disqualified judge. (See, e.g., *In re Marriage of Kelso* (1998) 67 Cal.App.4th 374, 383 [79 Cal.Rptr.2d 39]; *Geldermann, Inc. v. Bruner, supra,* 229 Cal.App.3d at p. 665.) But, without more, this does not constitute the kind of showing that would justify a finding that defendant's due process rights were violated.

In short, the circumstances of this case, as we view them, simply do not rise to a due process violation under the standard set forth by *Caperton* because, objectively considered, they do not pose " 'such a risk of actual bias or prejudgment' " (*Caperton, supra,* 556 U.S. at p. ___ [129 S.Ct. at p. 2263]) as to require disqualification.[4]

---

[4] Defendant cites two opinions of the Court of Appeal for the proposition that due process may be violated by the appearance of bias alone. Both of those decisions, *Catchpole v. Brannon* (1995) 36 Cal.App.4th 237 [42 Cal.Rptr.2d 440] and *Hall v. Harker* (1999) 69 Cal.App.4th 836 [82 Cal.Rptr.2d 44], involve a pattern of conduct by the judicial officer that rendered a fair trial impossible. This is also true of *In re Marriage of Iverson* (1992) 11 Cal.App.4th 1495 [15 Cal.Rptr.2d 70] and *Hernandez v. Paicius* (2003) 109 Cal.App.4th 452 [134 Cal.Rptr.2d 756]. Thus, notwithstanding language in those decisions about the appearance of bias, the facts amounted to a showing of actual bias based on comments by the judges about women (*Catchpole, Iverson*), lawyers (*Hall*) and noncitizens (*Paicius*) and should be understood in the context of those facts. To the extent that these opinions contain language inconsistent with our analysis in this case, that language is disapproved. (*Hernandez v. Paicius, supra,* 109

## III. DISPOSITION

Accordingly, we reverse the judgment of the Court of Appeal, vacate its denial of the petition for writ of habeas corpus, and remand the matter to that court for further proceedings consistent with this opinion.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Corrigan, J., concurred.