Filed 11/12/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B335084 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA079537) |
| v. | |
| TRAVIS ROCKHILL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Denise McLaughlin-Bennett and Emily Cole, Judges. Reversed and remanded with directions.

Mi Kim, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Kenneth C. Byrne and Ana R. Duarte, Deputy Attorneys General, for Plaintiff and Respondent.

———————————————

Travis Rockhill has twice been tried on a charge of murder. During the first trial, Rockhill made off-the-record, incriminating statements to the courtroom bailiff, who repeated them to the trial judge, Judge Emily Cole. Judge Cole disclosed this information to the parties, but the prosecution decided not to introduce evidence of Rockhill's incriminating statements. The jury ultimately deadlocked, the court declared a mistrial, and the case was tried a second time before Judge Cole. Following Rockhill's testimony in his defense and prior to closing arguments, Judge Cole sent ex parte text messages to a former colleague of hers at the Los Angeles County District Attorney's office, asking why the prosecutor in Rockhill's trial was not calling the bailiff to testify as a rebuttal witness and suggesting someone talk to the prosecutor about that. The prosecution did not take Judge Cole up on her suggestion, and the jury convicted Rockhill this time around.

After the jury rendered its verdict, the prosecution disclosed Judge Cole's ex parte communications to the defense. Judge Cole ultimately recused herself, acknowledging the impropriety of her communications but asserting she had been fair and impartial throughout the trial. Rockhill moved for a new trial based on Judge Cole's judicial bias and now appeals the denial of that motion by Judge Denise McLaughlin-Bennett.

Rockhill argues that the ex parte communications Judge Cole initiated with the prosecution demonstrate a probability of actual judicial bias that is too high to be constitutionally tolerable. He further contends the judge's conduct constitutes structural error, requiring reversal without a showing of prejudice. The People concede both points. We agree with the parties that this is an exceptional case with extreme facts that

amount to a due process violation and structural error. Judge Cole violated a core tenet of our criminal justice system by abandoning her role as an impartial arbiter and taking an interest in Rockhill's conviction. Accordingly, we reverse for a third trial.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Relevant Evidence Presented at the Second Trial*

    1. *Prosecution evidence*

On the evening of July 17, 2020, Gary Matthews was shot in the head outside his friend Nancy P.'s[1] home. Staggering and disoriented, Matthews got into his truck and drove three miles before colliding with a raised dirt berm. He was taken to the hospital and died from his gunshot wound several weeks later.

The day before the shooting, Rockhill went to Nancy's home to sell her a scooter; Nancy said she "would think about it." Rockhill had known Nancy for four years and had sold her things in the past.

Matthews came over later in the day and gave Rockhill a ride home. A few hours later, Matthews returned to Nancy's home and told Nancy that he thought Rockhill was charging her too much for the scooter. Later that night, Rockhill called Nancy and said he was angry with Matthews and that Matthews had "messed with the wrong guy."

The next evening, Matthews was at Nancy's home with Nancy and her neighbor, Faith L. A car pulled up outside, and

---

[1]    We refer to the witnesses by their first name and last initial only to protect their privacy interests. (See Cal. Rules of Court, rule 8.90(b)(10).)

Nancy told Faith that it looked like the car was headed toward Faith's home. Faith left, and as she walked home, she saw a truck parked in Nancy's driveway and Rockhill walking toward Nancy's home. Another man was in the driver's seat of the truck.

Meanwhile, Nancy saw her front screen door opening. A person who sounded like Rockhill said, " 'Is [Matthews] here?' " The person closed the screen door, walked down the front steps, and called out for Matthews a second time. Matthews walked outside, and seconds later Nancy heard a gunshot. She went outside and saw a car speeding away. Matthews, whom Nancy observed had an apparent gunshot wound near his temple, stumbled across the street to his truck, got in, and drove off.

2.   *Defense evidence*

Rockhill testified that the day before the shooting, he went to Nancy's house to sell her a scooter. While they were discussing how she would pay for it, Matthews arrived. Rockhill and Matthews did not know each other, but at Nancy's request Matthews gave Rockhill a ride home. That night, Rockhill spoke to Nancy on the phone and got the impression she was not going to buy the scooter.

The next day, Rockhill's friend Jimmy drove him to Nancy's house so that Rockhill could "retrieve the scooter and just leave." As Rockhill approached Nancy's front door, he saw Louie, who also went by "Primo," standing nearby. Rockhill was familiar with Louie because Louie "associated" with Nancy and Faith. Louie asked Rockhill to call Matthews out of Nancy's home because Louie had something to say to him. Rockhill did not know why Louie was there and did not know why Louie had such a request; Rockhill had no prior communications with Louie.

4

Without thinking much of it, Rockhill went to the front door and asked, " '[Matthews]. You in there?' " Nancy answered, " 'Yeah, he's in here,' " and Rockhill said, " 'Someone wants to talk to him real quick.' " Matthews came outside and, after seeing Louie, pulled out a gun. Rockhill saw a gunshot, ran back to the truck, and went home. Sometime after the shooting, Rockhill spoke to the police about the incident, telling them he "didn't know anybody" and was not present at the scene.

Matthew's ex-girlfriend Rebecca H. testified that Matthews had "a beef" with Louie. Two to three months before Matthews was shot, Matthews and Rebecca were driving by Louie's house, and Matthews saw Louie outside. Matthews slammed on the brakes, drove toward Louie erratically, and rushed out of the car toward Louie. Matthews yelled at Louie aggressively and acted like he wanted to fight him. Eventually, Matthews got back into the car and drove off.

B.      *Rockhill's Statement to the Courtroom Bailiff During the First Trial*

During Rockhill's first trial, the defense did not call any witnesses. After both sides rested, and the trial concluded for the day, Rockhill made a statement in front of the courtroom bailiff, Los Angeles County Sheriff's Deputy Randy Smalls. According to Smalls, as he was escorting Rockhill from the courtroom to the lockup area, Rockhill "spontaneously said 'I'm going to get off because I didn't shoot this guy.' " Smalls asked Rockhill if he knew who shot him. Rockhill said, " 'Primo shot him, he was only supposed to get beat up and robbed, it was a set up between the ladies and Primo and I got caught up in it because people have

been stealing stuff around the area.' " Smalls repeated to Judge Cole what Rockhill had said.

After the prosecution made its closing argument, Judge Cole held a discussion in chambers with both parties, which was transcribed by the court reporter. Judge Cole told the parties that she had learned of the conversation between the bailiff and Rockhill. Judge Cole added that the conversation was "conveyed to [her] probably inappropriately," but she did not believe she had "been made biased in any way."

The prosecutor, Los Angeles County Deputy District Attorney Yujin Yi, said she "would not argue for a mistrial" or request to reopen the prosecution's case. Yi added that if there was a mistrial due to a hung jury, Rockhill's statement to Smalls could be addressed in a future trial. The defense agreed. The jury ultimately deadlocked, and the court declared a mistrial.

C.      *The Second Trial and the Court's Ex Parte Communications*
During pretrial proceedings for Rockhill's second trial, the court granted the prosecution's motion to exclude Smalls from the courtroom. The prosecution did not call Smalls as a witness in its case-in-chief.

After the prosecution rested its case-in-chief and Rockhill testified, Judge Cole asked both parties to approach the bench. In an unrecorded sidebar discussion, the court asked Yi whether she was going to call anyone as a rebuttal witness, and Yi said, "[N]o."[2] The court then dismissed the jurors for the day.

---

[2]      Yi provided this information on the record during the sentencing hearing.

6

That same day at 3:54 p.m., Judge Cole, who previously was a prosecutor at the Los Angeles County District Attorney's Office, texted Deputy District Attorney Kevin Sexton, a former colleague who had been watching the trial. Judge Cole texted, "She's not calling Smalls after that??? Why??" Sexton responded, "Not a clue." Judge Cole replied, "Maybe people should talk it over with her???"

On the next court date, outside the presence of the jury, Judge Cole asked Yi, "Do you have any rebuttal?" Yi responded, "No." When the jury entered the courtroom, Judge Cole asked Yi again if she had any rebuttal, and she responded, "No." The court then instructed the jurors, the parties gave their closing arguments, and the jury began its deliberations.

Two days later, the court granted the defense's request to reopen the case to present Rebecca's testimony regarding the relationship between Matthews and Louie. After Rebecca testified, the parties gave additional closing arguments, the court gave additional instructions, and the jury restarted deliberations.

The jury found Rockhill guilty of first degree murder (Pen. Code, § 187, subd. (a)) and found true that he personally used a firearm during the commission of the murder (*id.*, § 12022.5, subd. (a)). Several days later, the prosecution disclosed Judge Cole's ex parte communications to defense counsel.

D.    *Judge Cole's Disclosures*

A few days after the prosecution disclosed the ex parte communications to the defense, Judge Cole held a proceeding in chambers with both sides. The court stated, "So this is my time to disclose, after both sides rested, during the jury trial, after hours, I sent a text message . . . not . . . [to] Yi, but another

[prosecutor] in the office, . . . inquiring why Deputy Smalls wasn't being called as a rebuttal witness. And then I commented that maybe someone should talk to . . . Yi about that. That's the entirety of the two text messages."

The court continued: "That was absolutely inexcusable ex parte communication. I was completely wrong in sending those text messages. And I'm not trying to justify my actions. . . . I've reflected over the entire trial, and I believe wholeheartedly during the course of the trial my rulings were fair and impartial; however, I am recusing myself from the remainder of the case pursuant to [Code of Civil Procedure section] 170.1."

The minute order from May 15 stated, "The court discloses that after each side rested, after hours, the court made inexcusable ex parte communications with another district attorney. The court does not try to justify inappropriate actions and admits wrongdoing. Further, the court states that she has reflected on the rulings made during the trial and believes that the rulings were fair and impartial. The court recuses itself pursuant to [Code of Civil Procedure section] 170.1. The case is transferred to Department A16 for sentencing on June 15, 2023."

On May 26, Judge Cole corrected the minute order to read, "The court discloses that after both side[s] rested their case in chief, trial had ended for the day, the court made inexcusable ex parte communications with another district attorney that had been watching the trial. A text message was sent at approximately 3:45 p.m. and concluded before 4:30 p.m."

E.      *Motion for a New Trial, and Sentencing*
The case was transferred to Judge McLaughlin-Bennett for sentencing. Rockhill filed a motion for a new trial arguing in

8

relevant part that the communication between Judge Cole and Sexton "revealed the trial judge's bias and demonstrated that . . . Rockhill did not receive a fair trial." The prosecution opposed.

Judge McLaughlin-Bennett denied the motion for a new trial in a written order without holding an evidentiary hearing. The court concluded that "[a]lthough the [ex parte] communication made was unfortunate and, without question, a violation of the ethical code of judicial canons, such communication, by itself [did] not warrant" a new trial.

To reach this conclusion, the court made two findings. First, it found that "[t]here [was] no evidence that the trial court engaged in the communication with the intent to intervene in the trial proceedings." Instead, the court found the communication "was made to reflect on and criticize a former colleague's trial performance." The court reasoned that while "[t]he timing of the communication" was "ill-advised," it was sent "after both parties apparently informed the trial court that neither intended to call any further witnesses." As further evidence of Judge Cole's lack of bias, the court pointed to the minute order from May 15, wherein Judge Cole stated she was "fair and impartial."

Second, the court found that "[t]here [was] no evidence that the ex parte communication affected the trial proceedings or the jury's verdict." The court emphasized that "the illicit communication was [not] repeated to the [prosecutor] during the pendency of the trial," Sexton did not have "any involvement with the trial," and "the jury was [not] even aware of the communication."

On November 6, at the sentencing hearing, defense counsel argued that Judge McLaughlin-Bennett's ruling "assigned what seemed like a fair amount of significance to the fact that the trial

9

judge's ex parte communication didn't occur until after the People had rested." Defense counsel continued to argue that while the prosecution had rested, "there was . . . a universal possibility of rebuttal witnesses," and in fact, on May 1, after Judge Cole made the ex parte communication, the judge "asked the People again if they were resting," which indicated Judge Cole "intended for at least something to happen . . . with [the ex parte] communication." Judge McLaughin-Bennett ruled that defense counsel's "additional [argument] would not change [her] ruling as there's nothing to indicate that the ex parte communication was made with the intent to impose itself in [the case]."

The court sentenced Rockhill to a total of 35 years to life imprisonment, consisting of 25 years to life for the first degree murder plus the upper term of 10 years for the firearm enhancement.

Rockhill timely appealed.

## DISCUSSION

Rockhill contends the court erred in denying his motion for a new trial based on Judge Cole's bias. He argues Judge Cole's ex parte communications with Sexton demonstrated a constitutionally intolerable possibility that Judge Cole harbored actual bias in favor of the prosecution, resulting in structural error that requires reversal for a new trial. The People agree, as do we.[3]

---

[3] Because we reverse the court's order denying the motion for a new trial, we need not address Rockhill's other claims of error, including insufficiency of the evidence, improper admission of witness testimony, improper exclusion of character evidence, and

A.    *Relevant Legal Principles*

1.    *Motion for a new trial*

When a verdict has been rendered against a defendant, he or she may move for a new trial under Penal Code section 1181. (Pen. Code, § 1181; *People v. Ault* (2004) 33 Cal.4th 1250, 1260 (*Ault*).)  Although Penal Code section 1181 states that a new trial may be granted only upon nine enumerated grounds, "new trials may nonetheless be granted on grounds not enumerated in the statute when necessary to protect a defendant's constitutional right to a fair trial." (*People v. Knoller* (2007) 41 Cal.4th 139, 158.)  "Where the procedure has fallen short of that standard, an accused has been denied due process, and the inherent power of the court to correct matters by granting a new trial transcends statutory limitations." (*People v. Oliver* (1975) 46 Cal.App.3d 747, 751, cited with approval in *Knoller*, at p. 158 [affirming order granting a new trial based on judicial misconduct].)  A defendant moving for a new trial has the burden of establishing grounds for relief.  (See *In re Carpenter* (1995) 9 Cal.4th 634, 657; *People v. Watts* (2018) 22 Cal.App.5th 102, 116-117.)

2.    *Judicial bias*

" ' "A criminal defendant has due process rights under both the state and federal Constitutions to be tried by an impartial judge." ' " (*People v. Nieves* (2021) 11 Cal.5th 404, 498 (*Nieves*); accord, *People v. Peoples* (2016) 62 Cal.4th 718, 788; see *In re Murchison* (1955) 349 U.S. 133, 136 (*Murchison*) ["[a] fair trial in a fair tribunal is a basic requirement of due process"].)  "Due

---

Judge McLaughlin-Bennett's alleged judicial bias in ruling on the new trial motion.

11

process guarantees 'an absence of actual bias' on the part of a judge." (*Williams v. Pennsylvania* (2016) 579 U.S. 1, 8 (*Williams*).)  A fundamental principal of due process is that " 'no man [or woman] is permitted to try cases where he [or she] has an interest in the outcome.' " (*Id.* at p. 9; accord, *Murchison*, at p. 136.)

"[O]ur system of law has always endeavored to prevent even the *probability* of unfairness." (*Murchison, supra*, 349 U.S. at p. 136, italics added.)  Because "[b]ias is easy to attribute to others" but "difficult to discern in oneself," the test for bias is "not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, 'the average judge in his position is "likely" to be neutral, or whether there is an unconstitutional "potential for bias." ' " (*Williams, supra*, 579 U.S. at p. 8; see *Nieves, supra*, 11 Cal.5th at p. 498 ["[e]stablishing a violation of [the] right [to be tried by an impartial judge] requires 'an objective assessment of the circumstances in the particular case' "].)  "The difficulties of inquiring into actual bias, and the fact that the inquiry is often a private one, simply underscore the need for objective rules.  Otherwise there may be no adequate protection against a judge who simply misreads or misapprehends the real motives at work in deciding the case." (*Caperton v. A. T. Massey Coal Co., Inc.* (2009) 556 U.S. 868, 883 (*Caperton*); accord, *People v. Freeman* (2010) 47 Cal.4th 993, 1004, 1006 (*Freeman*).)  "Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties.  But to perform its high function in the best way 'justice must satisfy the appearance of justice.' " (*Murchison*, at p. 136.)

"[W]hile a showing of actual bias is not required for judicial disqualification under the due process clause, neither is the mere appearance of bias sufficient.  Instead, based on an objective assessment of the circumstances in the particular case, there must exist ' "the probability of actual bias on the part of the judge or decisionmaker [that] is too high to be constitutionally tolerable." ' "  (*Freeman*, *supra*, 47 Cal.4th at p. 996; accord, *Nieves*, *supra*, 11 Cal.5th at p. 498; *People v. Clark* (2021) 73 Cal.App.5th 95, 101.)  In other words, the defendant must make a "heightened showing of a probability, rather than the mere appearance, of actual bias to prevail." (*Freeman*, at p. 1006; accord, *People v. Cowan* (2010) 50 Cal.4th 401, 457 (*Cowan*).) " '[I]t is the exceptional case presenting extreme facts where a due process violation will be found.' " (*Nieves*, at p. 498; accord, *Freeman*, at p. 1005; see *Cowan*, at p. 458 [no due process violation occurs where "facts are not so extreme or extraordinary that they would tempt ' "the average . . . judge . . . not to hold the balance nice, clear and true between the State and the accused" ' "].)

It is axiomatic that prosecutors and judges must adhere to their distinct roles in our criminal justice system.  Prosecutors "are servants of the People, obliged to pursue . . . the interests of justice and of the community as a whole." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 709.)  Prosecutors are "not . . . indifferent to the conviction or acquittal of the defendant"; indeed, they are "advocate[s] for the defendant's conviction." (*People v. Vasquez* (2006) 39 Cal.4th 47, 55, 69; see *id*. at p. 65 ["[z]ealous advocacy in pursuit of convictions forms an essential part of the prosecutor's proper duties"].)  In contrast, " 'the judge has a duty to be impartial and to make certain that the defendant

in a criminal case is afforded a fair trial.' " (*People v. Thomas* (2021) 64 Cal.App.5th 924, 959 (*Thomas*).)  In this sense, "the basic guardians of the defendant's rights at trial are his attorneys and the court, not the prosecutor." (*Vasquez*, at p. 69.)

It follows that "the trial court must not undertake the role of . . . prosecutor." (*People v. Carlucci* (1979) 23 Cal.3d 249, 258; see *People v. Santana* (2000) 80 Cal.App.4th 1194, 1207.)  Nor may the trial court " ' "create the impression it is allying itself with the prosecution." ' " (*Nieves*, *supra*, 11 Cal.5th at p. 477; see *People v. Williams* (2021) 60 Cal.App.5th 191, 203 [" 'a judge should be careful not to throw the weight of his judicial position into a case, either for or against a defendant. . . .  It is a fundamental principle underlying our jurisprudence.' "].)  An unconstitutional probability of actual bias exists when the trial judge usurps the role of the prosecutor and takes an interest in the defendant's conviction.  (See *Nieves*, at p. 499 [constitutionally intolerable possibility exists that judge harbors bias when judge "express[es] bias toward defendant" and takes "an interest in defendant's conviction or sentence"]; *Knudsen v. Department of Motor Vehicles* (2024) 101 Cal.App.5th 186, 212-213 ["Because the hearing officer acted as an advocate *and adjudicator*, [plaintiff's] due process right to an impartial adjudicator was violated."]; *People v. Campbell* (1958) 162 Cal.App.2d 776, 787 ["When the trial judge officiously and unnecessarily usurps the duties of the prosecutor by taking over the questioning of witnesses and in so doing creates the impression that he is allying himself with the prosecution, harm to the defendant is inevitable."]; see also *Murchison*, *supra*, 349 U.S. at pp. 136-137 [unconstitutional potential for bias existed where same judge who presided at contempt hearing had

14

also served as the "one-man grand jury" out of which contempt charges arose]; *Tumey v. Ohio* (1927) 273 U.S. 510, 534 ["A situation in which an official perforce occupies two practically and seriously inconsistent positions, one partisan and the other judicial, necessarily involves a lack of due process of law in the trial of defendants charged with crimes before him."].)

When the trial judge's conduct reflects an unconstitutional probability of actual bias, the error is structural and "cannot be deemed harmless." (*Williams*, *supra*, 579 U.S. at p. 14; see *id.* at p. 16 ["a due process violation arising from the participation of an interested judge is a defect 'not amenable' to harmless-error review" and instead is structural error]; *Arizona v. Fulminante* (1991) 499 U.S. 279, 309-310 [a trial before "a judge who was not impartial" is a structural defect and is not subject to harmless error]; *Nieves*, *supra*, 11 Cal.5th at p. 499; *In re James F.* (2008) 42 Cal.4th 901, 914.) " '[T]he fact that a record shows a defendant to be guilty of a crime does not necessarily determine that there has been no miscarriage of justice.' " (*Nieves*, at p. 502.)

     3.    *Standard of review*

It is settled that the standard for reviewing a trial court's order *granting* a motion for a new trial is abuse of discretion. (*Ault*, *supra*, 33 Cal.4th at pp. 1255-1256.) However, in cases such as this, where the trial court *denied* a motion for a new trial, "the authorities are less clear regarding the standard of review." (*People v. Albarran* (2007) 149 Cal.App.4th 214, 224, fn. 7; see *Ault*, at p. 1262, fn. 7 ["the modern authorities are by no means uniform" on the standard of review for an order denying a motion for new trial].) Both parties contend we should apply independent review, and we agree.

15

Several factors at play here dictate that we apply an independent review standard. One is "the *importance of the legal rights or interests at stake.*" (*Ault, supra,* 33 Cal.4th at p. 1265.) Courts have consistently applied an independent standard of review to mixed questions of law and facts where constitutional rights are implicated. (*Id.* at p. 1264, fn. 8 ["California and federal cases have deemed the independent review standard appropriate for a diverse array of mixed law and fact questions, often on the ground, among others, that such questions were constitutionally significant"]; *People v. Cromer* (2001) 24 Cal.4th 889, 901 ["Our conclusion that a trial court's due diligence determination is subject to independent review comports with this court's usual practice for review of mixed question determinations affecting constitutional rights."]; *Albarran, supra,* 149 Cal.App.4th at p. 224, fn. 7 [applying independent review "[b]ecause the present case . . . implicates defendant's federal constitutional rights to due process and concerns the fundamental fairness of his trial"].) As both parties acknowledge, Rockhill's motion for a new trial implicates his fundamental constitutional right to an impartial judge.

"[A]nother important consideration in determining the appropriate standard of review is the *consequences of an erroneous determination* in the particular case." (*Ault, supra,* 33 Cal.4th at p. 1266.) Unlike an order granting a motion for a new trial, an order denying such a motion is a " 'dispositive' motion," in that it finally determines the defendant's case. (*Ibid.*) "[I]ndependent appellate review of a mixed law and fact question is crucial when an excessively deferential appellate affirmance risks error in the *final determination* of a party's rights, either as

16

to the entire case, or on a significant issue in the litigation." (*Ibid*.)

For these reasons, independent review is the appropriate standard here. "[U]nder independent review, an appellate court exercises its independent judgment to determine whether the facts satisfy the rule of law." (*In re George T.* (2004) 33 Cal.4th 620, 634.) Independent review is not the same as de novo review " 'in which a reviewing court makes an original appraisal of all the evidence to decide whether or not it believes' the outcome should have been different. [Citation.] Because the trier of fact is in a superior position to observe the demeanor of witnesses, credibility determinations are not subject to independent review." (*Ibid*.) Accordingly, "[i]n ruling on [a] defendant's motion for [a] new trial, . . . [w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence." (*People v. Nesler* (1997) 16 Cal.4th 561, 582.)

B.      *The Court Erred in Denying the Motion for a New Trial*

We agree with the parties that the court erred in denying Rockhill's motion for a new trial based on judicial bias. This is an "exceptional case presenting extreme facts" that amounted to a due process violation, resulting in structural error. (*Freeman*, *supra*, 47 Cal.4th at p. 1005.)

After Rockhill testified, Judge Cole asked the trial prosecutor, Yi, if she was going to call any rebuttal witnesses, to which Yi responded, "[N]o." With this knowledge, Judge Cole texted Sexton, another prosecutor who had been watching the trial, to ask why Yi was not calling Deputy Smalls as a rebuttal witness. Judge Cole further texted that "people should talk" to Yi

17

about "not calling Smalls." These texts communicated to Sexton that Yi should call Smalls to testify and that someone from the district attorney's office should convey that message to Yi. For several reasons, Judge Cole's ex parte communications illustrate her intent to usurp the role of the prosecutor and influence the case against Rockhill.

First, Judge Cole improperly counseled the prosecution on trial strategy. "In a criminal case, a trial judge has a statutory duty 'to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved.' ([Pen. Code,] § 1044.)" (*Thomas, supra*, 64 Cal.App.5th at pp. 958-959.) In the discharge of this duty, a trial judge may, for instance, examine witnesses to elicit or clarify testimony, as well as comment on witness testimony.[4] (*People v. Santana, supra*, 80 Cal.App.4th at p. 1206.) However, the judge must not, under the guise of controlling the proceedings, instruct either party on trial strategy, including deciding which witnesses to call to the stand. (See *People v. Sturm* (2006) 37 Cal.4th 1218, 1237 [trial judges must not " 'lend their influence to one side or the other' "]; *People v. Cummings* (1993) 4 Cal.4th 1233, 1305 [" 'The trial judge . . . must not become an advocate for either party' "], abrogated on other grounds in *People v. Merritt* (2017) 2 Cal.5th 819, 821-822.) By telling the prosecution (in an ex parte text message, no less) that it should call a witness to the stand, Judge

---

[4]     While "[a] trial court may comment on the evidence," "such comments 'must be accurate, temperate, nonargumentative, and scrupulously fair.' " (*People v. Sturm* (2006) 37 Cal.4th 1218, 1232.)

18

Cole improperly used the weight of her position as a judge to advise the prosecution how to conduct its case.

Second, Judge Cole advocated for the People to call a witness who was undeniably favorable to the prosecution. This is apparent by examining the content of Smalls's potential testimony. According to Smalls, Rockhill told him that he was involved in a plan with "the ladies and Primo" (i.e., Louie) to "beat up and rob[]" Matthews. Rockhill further said that Primo departed from the plan and shot Matthews. These alleged statements are inconsistent with Rockhill's testimony at trial. Rockhill testified that he was present at the scene of the shooting only because he planned to "retrieve the scooter and just leave." He also testified that he did not know why Louie was present at the scene and that he had no prior communications with Louie. Consequently, had Smalls testified, his testimony would have impeached Rockhill's testimony and substantially undermined both Rockhill's credibility and his substantive defense. By advocating for the prosecution to call Smalls as a rebuttal witness, Judge Cole's purpose appears inescapable: to strengthen the prosecution's case to convict Rockhill. This was antithetical to her duty " 'to make certain that [Rockhill] . . . [was] afforded a fair trial.' " (*Thomas*, *supra*, 64 Cal.App.5th at p. 959.) Judge Cole's actions suggest she "harbored an interest in the outcome of [Rockhill's] trial." (*Nieves*, *supra*, 11 Cal.5th at p. 499.)

Lastly, Judge Cole's advocacy *could* have influenced the trial in favor of the prosecution, considering the timing of her ex parte communications. Judge Cole texted Sexton after Rockhill testified and Yi indicated she did not intend to call any more witnesses. At that time, neither party had begun closing arguments. If Judge Cole's texts had their intended effect, in

19

that prosecutors in the district attorney's office persuaded Yi to call Smalls as a rebuttal witness, Yi could have called Smalls to the stand on the next court date. Indeed, when the trial resumed, Judge Cole twice asked Yi if she had any rebuttal witnesses, illustrating Judge Cole's understanding that there was still an opportunity for Yi to change her mind. Judge Cole's ex parte communications thus were not, as Judge McLaughlin-Bennett found, made solely "to reflect on and criticize a former colleague's trial performance." Instead, the fact that Judge Cole sent the texts at a time when Yi could still call Smalls to the stand suggests Judge Cole intended to influence the prosecution's case. This was a violation of Rockhill's due process right to an impartial judge. (See *Nieves*, *supra*, 11 Cal.5th at p. 499; *Knudsen v. Department of Motor Vehicles*, *supra*, 101 Cal.App.5th at pp. 212-213.)

In denying Rockhill's motion for a new trial, Judge McLaughlin-Bennett relied on Judge Cole's own "representation" in a minute order that "during the trial proceedings, [Judge Cole] was fair and impartial and made fair rulings." However, as noted, the standard for assessing bias is an objective one and "not whether a judge harbors an actual, subjective bias." (*Williams*, *supra*, 579 U.S. at p. 8; accord, *Cowan*, *supra*, 50 Cal.4th at p. 457.) Indeed, Judge Cole's other representations in minute orders "underscore the need for objective rules." (*Caperton*, *supra*, 556 U.S. at p. 883.) In the initial minute order regarding Judge's Cole's disclosure of her ex parte communications, Judge Cole stated that she sent the text messages "after each side rested." This representation was inaccurate because the evidentiary portion of the trial had not yet concluded. And although Judge Cole later corrected the minute order to state

20

that "both sides had rested their case in chief," this correction, although technically accurate, was misleading because it did not fully reflect that Yi still had an opportunity to call a rebuttal witness. Given "the inherent subjectivity involved in an individual judge's examination of his or her own bias" (*Freeman*, *supra*, at 47 Cal.4th at p. 1004), the objective test is necessary to protect "against a judge who simply misreads or misapprehends the real motives at work" (*Caperton*, at p. 883).

This exceptional case involves " 'extreme facts' " that offended Rockhill's due process right to a criminal trial before an impartial judge. (*Nieves*, *supra*, 11 Cal.5th at p. 499.) Judge Cole's extraordinary ex parte communications "reflect a constitutionally intolerable possibility that [she] harbored an interest in the outcome of defendant's trial." (*Ibid.*) To summarize, Judge Cole sought to persuade the prosecution to call a witness who was undoubtedly favorable to its case and at a time when the prosecution could still do so. The apparent purpose of Judge Cole's ex parte communications was to assist the prosecution in obtaining a conviction. Judge Cole thus took on the role of the prosecutor and attempted to tip the scales of justice against Rockhill. She deviated so far from her role as an impartial judge that her conduct establishes " 'an unconstitutional "potential for bias." ' " (*Williams*, *supra*, 579 U.S. at p. 8; see *Cowan*, *supra*, 50 Cal.4th at p. 456.) The error is structural, requiring automatic reversal without regard to whether Rockhill suffered any prejudice. (*Williams*, at p. 14; *Nieves*, at p. 499.) Accordingly, Rockhill is entitled to a new trial.

21

## DISPOSITION

The judgment is reversed.  The trial court is directed to set aside its order denying Rockhill's motion for a new trial and enter a new order granting it.

STONE, J.

We concur:

SEGAL, Acting P. J.

FEUER, J.